804 F.2d 1113
 1986-2 Trade Cases 67,355, 6 Fed.R.Serv.3d 639
 Jerome LaSALVIA and Peggy LaSalvia, husband and wife,
Plaintiffs-Appellants,
v.
UNITED DAIRYMEN OF ARIZONA, an Arizona marketing
association; Robert M. Girard; and Leonard F.
Cheatham, Defendants-Appellees.
 No. 85-1592.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Feb. 10, 1986.
Decided Nov. 21, 1986.
 
 Rex Lee, Robert J. Gibson, Phoenix, Ariz., for plaintiffs-appellants.
 Sydney Berde, Berde & Hagstrom, P.A., St. Paul, Minn., for defendants-appellees.
 Appeal from the United States District Court for the District of Arizona.
 Before GOODWIN, HUG and REINHARDT, Circuit Judges.
 GOODWIN, Circuit Judge:
 
 
 1
 Jerome and Peggy LaSalvia, operators of an independent dairy farm in Laveen, Arizona, appeal the dismissal of their antitrust claims against defendants United Dairymen of Arizona ("UDA"), a dairy farmers' cooperative, Robert Girard, its general manager, and Leonard Cheatham, its president until 1983. Both the LaSalvias and UDA produce milk within the U.S. Department of Agriculture's Central Arizona Milk Marketing Area ("CAMMA"). The district court excluded evidence of several of the LaSalvias' allegations on the grounds that the LaSalvias lacked standing to challenge the conduct alleged.[1] The court then granted summary judgment for the defendants on the grounds that the LaSalvias' remaining claims were time-barred under 15 U.S.C. Sec. 15b (1982). The court also denied a motion for leave to file an amended complaint. We reverse and remand for further proceedings.
 
 
 2
 The LaSalvias sued UDA for violations of sections 1 and 2 of the Sherman Act, 15 U.S.C. Secs. 1, 2 (1982), section 2 of the Clayton Act as amended by the Robinson-Patman Act, 15 U.S.C. Sec. 13 (1982), and section 3 of the Clayton Act, 15 U.S.C. Sec. 14 (1982). Their complaint alleged that UDA, beginning shortly after its formation in 1959, had monopolized and attempted to monopolize the marketing of Grade A raw milk in the CAMMA, and that UDA had conspired to restrain trade with area raw milk processors ("handlers"). Plaintiffs cite six practices to support their claims:
 
 
 3
 1. UDA's entering into full supply contracts with handlers and discriminating against handlers unwilling to enter into such contracts (the concerted refusal to deal claim);
 
 
 4
 2. UDA refused to purchase plaintiffs' excess fluid milk for processing into storable form until after this action was filed (the unilateral refusal to deal claim), and then paid them a price below the Order 131 blend price;[2]
 
 
 5
 3. UDA gave rebates to handlers;4. UDA adopted and enforced a "base plan" system for calculating its members' monthly milk payments that included overly restrictive covenants not to compete;[3]
 
 
 6
 5. UDA entered into reserve and pooling agreements with out-of-state cooperatives, and;
 
 
 7
 6. UDA acquired control of raw milk transportation in the CAMMA.
 
 
 8
 The district court granted UDA's motion to exclude from trial evidence of its base plan, its rebates to handlers, and its acquisition of milk transportation facilities on the grounds that the LaSalvias were not proper parties to challenge this conduct. The court also excluded evidence of UDA's marketing agreements with other cooperatives, its purchase of other producer-handler operations, and its refusal to process the milk of other producer-handlers on the grounds that these allegations were not included in the complaint.[4]
 
 I. The Exclusion of Evidence Under Rule 16
 
 9
 Section four of the Clayton Act, 15 U.S.C. Sec. 15(a) (1982), affords a private action for damages to "any person who shall be injured in his person or property by reason of anything forbidden in antitrust laws." Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977), and its progeny limit section four's scope to those plaintiffs who have sustained the type of injury that the antitrust laws were meant to remedy. In Brunswick, the Court concluded that a competitor seeking to enjoin a potentially procompetitive merger was not a proper party to sue under the antitrust laws. Brunswick thus requires that the conduct alleged be harmful to the competitive process, and not merely to a given competitor. In Blue Shield of Virginia v. McCready, 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982), the Court relied on a remoteness analysis to grant a consumer standing to challenge a conspiracy to exclude psychologists from the health care market. McCready looked to two factors in assessing whether the plaintiff was a proper party to challenge the defendants' conduct. First, it cited Illinois Brick Co. v. Illinois, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), which required that the plaintiff be directly injured by the anticompetitive conduct. 457 U.S. at 473-78, 102 S.Ct. at 2545-48. Second, it looked to the Brunswick competitive harm requirement. Id. at 478-79, 102 S.Ct. at 2547-48.
 
 
 10
 In Associated General Contractors, Inc. v. California State Council of Carpenters, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983), the Court set out the factors to be considered in determining whether a plaintiff is the proper party to challenge given conduct. Although a plaintiff must allege harm to himself from the defendant's anticompetitive conduct, this does not, standing alone, bring the plaintiff within section four's reach. Id. at 537, 103 S.Ct. at 908.
 
 
 11
 We recently summarized the Associated General Contractors' factors as follows:
 
 
 12
 "[T]he nature of plaintiff's injury, the directness or indirectness of the asserted injury, the potential for duplicative recovery or complex apportionment of damages, the speculative nature of damages asserted, and the existence of more direct victims of the alleged violation are factors a court must consider when making the 'proper party' determination."Exhibitors' Service, Inc. v. American Multi-Cinema, Inc., 788 F.2d 574, 578 (9th Cir.1986).
 
 
 13
 The LaSalvias undoubtedly are proper parties to challenge UDA's allegedly anticompetitive conduct. As one of UDA's remaining competitors in the CAMMA, they meet the directness requirement, and they have an incentive vigorously to seek redress for the harms caused by any exploitation by UDA of its market position. Plaintiffs allege that the base plan, the rebates to handlers, and the acquisition of the transport facilities were employed in an unlawful quest for market dominance. The harm alleged is thus precisely the sort that the antitrust laws were intended to remedy.
 
 
 14
 We reject defendants' argument that because the LaSalvias have not alleged harm from the allegedly monopolistic practices they lack constitutional and antitrust standing. The LaSalvias have alleged unlawful monopolization and attempted monopolization, and are entitled to set forth the practices they believe UDA used in an effort either to obtain monopoly power or to exploit it. Rather than giving rise to liability independently, the allegedly unlawful practices serve an evidentiary function. See Ostrofe v. H.S. Crocker Co., 740 F.2d 739, 743 (9th Cir.1984), cert. dismissed, 469 U.S. 1200, 105 S.Ct. 1155, 84 L.Ed.2d 309 (1985) (evidence of a price-fixing conspiracy admissible as probative of the existence of a second, related conspiracy). Lastly, defendants' theory that their questioned practices are lawful go to the merits of plaintiffs' claim, which are not before this court.[5]
 
 
 15
 The district court, in excluding the evidence of the base plan, the rebates, and the integration of milk transportation facilities, confused the prudential limitations on private antitrust actions with the requirements of damage-in-fact and causation. The court based the exclusion upon the LaSalvias' purported failure to show injury independent of that resulting from the alleged refusals to deal. This concern goes not to the limitation on private antitrust suits, but to a perceived failure of the LaSalvias' proof to show damage from the questioned practices. The district court's exclusion of the evidence of the UDA base plan, its rebates to handlers, and its acquisition of milk transportation facilities requires reversal of the judgment.
 
 
 16
 We also note that the court's exclusion of the evidence of UDA's marketing agreements with other cooperatives was error. Under the federal rules a plaintiff need not allege every act he or she intends to prove in support of the claim for relief. A complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a). See also 2A J.W. Moore & J.D. Lucas, Moore's Federal Practice p 8.03 (2d ed. 1983).
 
 
 17
 II. The Grant of Summary Judgment on the Refusal to Deal Claims
 
 
 18
 The district court concluded that the Clayton Act's four-year statute of limitations, 15 U.S.C. Sec. 15b (1982), barred both the unilateral and concerted refusal to deal claims. Plaintiffs filed the complaint on March 31, 1980. The court found that UDA did not unilaterally refuse to deal with plaintiffs within the four preceding years. It also found that the concerted refusal to deal claim stemmed from contracts entered into between UDA and other Arizona handlers as early as 1960, and that plaintiffs were aware of these contracts before the end of 1975.
 
 
 19
 We review grants of summary judgment de novo, and like the district court apply Federal Rule of Civil Procedure 56. British Airways Board v. Boeing Co., 585 F.2d 946, 951 (9th Cir.1978), cert. denied, 440 U.S. 981, 99 S.Ct. 1790, 60 L.Ed.2d 241 (1979). We reverse as to both claims.[6]A. The Unilateral Refusal to Deal Claim.
 
 
 20
 The district court relied upon David Orgell, Inc. v. Geary's Stores, Inc., 640 F.2d 936 (9th Cir.), cert. denied, 454 U.S. 816, 102 S.Ct. 92, 70 L.Ed.2d 84 (1981), in granting summary judgment for defendants on the LaSalvias' unilateral refusal to deal claim. The court's treatment of Orgell is ambiguous. Defendants understand the district court's view to be that any refusal to deal subsequent to an initial refusal is a mere reaffirmation, and thus the Clayton Act's statute of limitations runs from the initial refusal. Orgell, however, merely applies AMF, Inc. v. General Motors Corp. (In re Multidistrict Vehicle Air Pollution), 591 F.2d 68 (9th Cir.) (Air Pollution ), cert. denied, 444 U.S. 900, 100 S.Ct. 210, 62 L.Ed.2d 136 (1979). See Hennegan v. Pacifico Creative Service, Inc., 787 F.2d 1299, 1301 (9th Cir.1986). In Air Pollution, we held that because the defendants' initial refusal to deal was "irrevocable, immutable, permanent and final," any harm necessarily resulted from the initial refusal and not from subsequent reaffirmations. 591 F.2d at 72. Because the plaintiff in that case was not injured by the defendants' subsequent conduct, the statute of limitations ran from the initial refusal. Rather than stating a per se rule governing repeated refusals to deal, Air Pollution and Orgell merely apply the usual rule that antitrust claims accrue when the plaintiff incurs the injury. Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 338, 91 S.Ct. 795, 806, 28 L.Ed.2d 77 (1971). See Western Shoe Gallery, Inc. v. Duty Free Shoppers, Ltd., 593 F.Supp. 348, 352 n. 4 (N.D.Cal.1984).
 
 
 21
 At issue therefore is the finality of UDA's refusal to handle the LaSalvias' excess production, and the source of the harm allegedly inflicted by defendants upon them.
 
 
 22
 Plaintiffs argue that a material question of fact exists as to whether UDA's refusal to accept its milk for handling in 1975 was final, and that summary disposition of the unilateral refusal claim was thus error. They cite the deposition testimony of defendant Girard, UDA's general manager, regarding his 1975 refusal to accept plaintiffs' milk. They also rely upon their allegation, supported by affidavit and denied by UDA's counsel, that in 1977 and 1978 their attorney again requested access to UDA's manufacturing facility. Lastly, they argue that UDA's acceptance in 1981 of their milk for processing cuts against any finding that the 1975 refusal was final. In response, defendants argue that if plaintiffs' characterization of Girard's statement is true, then no illegal refusal to deal occurred and they should prevail on the merits. They also cite deposition testimony by plaintiffs suggesting that UDA's initial refusal was unequivocal.
 
 
 23
 The evidence on the finality of UDA's refusal to deal with the LaSalvias is ambiguous. On the one hand, Girard's testimony can be read to give plaintiffs some hope that UDA would relent, and thus accept their milk for processing. He expressly denied telling Jerome LaSalvia in 1975 that LaSalvia was not to call again to request that UDA handle his excess production. Gerard stated that during this conversation he informed LaSalvia that if UDA later had the capacity to handle plaintiffs' milk, it would so inform him. On the other hand, the LaSalvias' testimony suggests that the 1975 refusal was in fact unequivocal.
 
 
 24
 The district court, in concluding that UDA's 1975 refusal was final and subsequent denials were mere reaffirmations, thus resolved a material factual question that would ordinarily go to the jury. Because summary disposition is allowed only if "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law," Fed.R.Civ.P. 56(c), the court should not have granted summary judgment on the unilateral refusal to deal claim.
 
 
 25
 The initial refusal to deal in Air Pollution was necessarily final because the product, if it was to be used at all, had to be integrated into the design of new automobiles. 591 F.2d at 72. Therefore, finality was easily assessed because it turned upon a peculiarity of the product market at issue and not upon the subjective intent of the defendants. By contrast, the brief opinion in Orgell does not disclose the basis for its conclusion that the initial refusal was both final and the source of the plaintiff's injury. Orgell may encourage ambiguous responses to requests to deal coupled with later allegations that those denials were final. We therefore place on defendants the burden of showing that their initial refusal to deal was in fact final, and that the finality of the refusal was conveyed to the plaintiff. A self-serving allegation of finality made in the course of litigation is insufficient to meet this burden.
 
 
 26
 A finding of finality upon remand will not, of course, conclusively resolve the Sec. 15b question. Under Air Pollution and Orgell, the district court must also determine whether the damage to plaintiff, if any, resulted solely from the initial refusal. If it did not, and damage accrued during the four years preceding the filing of the complaint, then the action is not barred despite the finality of the refusal. Plaintiffs' damage analysis claimed losses both from the failure of their business to grow as projected, and the price differential between the Order 131 price available if they could have sold their total production within the CAMMA, and the lower price they received by selling milk in other markets. Under this damage theory, plaintiffs claim harm from UDA's exploitation of its market position. The losses claimed in plaintiffs' damage analysis stem not from the initial refusal, but from the unlawful monopolization of the market at issue.
 
 
 27
 Because the district court resolved a material question of fact, and because the record suggests that plaintiffs allege damage incurred within the statutory period, the summary judgment on plaintiffs' unilateral refusal to deal claim must be reversed. Because the district court addressed only the finality question, we cannot determine whether the parties had an opportunity to address the source and timing of the damage question. They should be afforded that opportunity upon remand.
 
 B. The Concerted Refusal to Deal Claim
 
 28
 Because Air Pollution involved a concerted refusal to deal, its analysis arguably should also govern the LaSalvias' concerted refusal claim. We decline to apply it, however, because of the fundamental differences in the conduct underlying the concerted refusal claims in Air Pollution and in this case. The plaintiff in Air Pollution alleged a group boycott. Such conduct is analytically indistinguishable from a unilateral refusal for statute of limitations purposes. In most instances the harm incident to such refusals stems from the refusal itself. Continuing harm is not at issue, and thus the finality of the refusal will usually determine the triggering of the statute of limitations. In this case plaintiffs allege use of long-term contracts to achieve or to maintain market dominance. The harm alleged stems from the exploitation of market dominance to deprive plaintiffs of an opportunity to market their milk within the CAMMA. Thus, finality is not at issue. Rather than looking to Air Pollution, we therefore look to the Supreme Court's continuing harm analysis.
 
 
 29
 In Hanover Shoe Co. v. United Shoe Machinery Corp., 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968), the Court established a limited exception to the usual rule that an antitrust claim accrues when the plaintiff incurs the injury. The Hanover Shoe exception applies when the anticompetitive conduct complained of constitutes a continuing violation and results in continuing harm. In that case, overcharges paid by the plaintiff because of the defendant's lease-only policy for its shoe manufacturing machinery resulted from a "continuing violation of the Sherman Act" which inflicted "continuing and accumulating harm" on the plaintiff. Id. at 502 n. 15, 88 S.Ct. at 2236 n. 15. The plaintiff alleged that the defendant, by exploiting its monopoly power, inflicted a continuing loss on the plaintiff through the use of damaging contracts. The LaSalvias allege that UDA has used its market position to impose contracts on handlers within the CAMMA that prohibited them from dealing with plaintiffs. That the contract in Hanover Shoe was between the parties to the suit and those here were between UDA and third parties does not lessen the force of the continuing harm analysis. In Twin City Sportservice, Inc. v. Charles O. Finley & Co., 512 F.2d 1264, 1270 (9th Cir.1975), we relied upon Hanover Shoe in concluding that the purchaser of a sports franchise could challenge a long-term exclusive supply contract between a former owner of the franchise and a concessionaire even though the contract was formed more than four years before suit was filed.
 
 
 30
 The district court in this case refused to apply the continuing harm doctrine, looking instead to the time the LaSalvias learned of the full supply contracts. Because the relevant inquiry is not when they learned of the contracts but whether the harm alleged continued into the four-year period preceding the filing of the complaint, the summary judgment on the concerted refusal to deal claim is reversed. We note, however, that while plaintiffs may recover for damages they prove were caused by anticompetitive conduct begun before the four-year statutory period under the continuing harm doctrine, their recovery is limited to damage incurred within the four years preceding the filing of the complaint. See Hanover Shoe, 392 U.S. at 502, 88 S.Ct. at 2236 (plaintiff entitled to damages "for the entire period permitted by the applicable statute of limitations") (footnote omitted); cf. Hanson v. Shell Oil Co., 541 F.2d 1352, 1361 (9th Cir.1976) (limiting damages to the statutory period under the speculative damages doctrine), cert. denied, 429 U.S. 1074, 97 S.Ct. 813, 50 L.Ed.2d 792 (1977).
 
 
 31
 III. The Denial of Plaintiffs' Motion for Leave to File an Amended Complaint
 
 
 32
 Plaintiffs sought to amend their complaint in October 1984, to allege post-complaint injury. The district court denied the motion on the grounds that they had known of the conduct alleged since 1981, that the new allegation was a disguised challenge to UDA's base plan, and that amendment would require the reopening of discovery. We review the denial for abuse of discretion. Howey v. United States, 481 F.2d 1187, 1190 (9th Cir.1973). We conclude that the district court abused its discretion in denying the motion for leave to amend.
 
 
 33
 Federal Rule of Civil Procedure 15(d) allows the addition of post-complaint allegations. Motions to amend pursuant to Rule 15(d) should be granted "[u]nless undue prejudice to the opposing party will result." Howey, 481 F.2d at 1190. We see no prejudice to defendants in allowing the amendment. Because most of the information on the added claim would be available in UDA's own files, little additional discovery would be needed. Defendants rely upon Waters v. Weyerhaeuser Mortgage Co., 582 F.2d 503, 506-07 (9th Cir.1978), in arguing that because plaintiffs could have sought amendment at an earlier date and because discovery would have to be reopened if the motion were granted, the district court did not abuse its discretion in denying the motion. Waters, however, involved "obvious prejudice" to the defendants because plaintiffs sought to litigate an issue that they had previously conceded. Id. at 507. It thus is not controlling under these facts.
 
 
 34
 "The purpose of [Rule 15(d) ] is to promote as complete an adjudication of the dispute between the parties as is possible." C.A. Wright & A.R. Miller, Federal Practice and Procedure Sec. 1504, at 536 (1971). Because UDA would not be unduly prejudiced by the minimal further discovery that may be required, the district court on remand should allow the motion.
 
 
 35
 REVERSED and REMANDED.
 
 
 
 [1]
 Although the district court characterized the issue as one of "standing," in order to avoid confusion between "antitrust standing" and "constitutional standing," we treat the issue as one of whether plaintiffs were proper parties to challenge defendants' allegedly anticompetitive conduct. Exhibitors' Service, Inc. v. American Multi-Cinema, Inc., 788 F.2d 574, 576 n. 1 (9th Cir.1986). See Associated General Contractors, Inc. v. California State Council of Carpenters, 459 U.S. 519, 535 n. 31, 103 S.Ct. 897, 907 n. 31, 74 L.Ed.2d 723 (1983)
 
 
 [2]
 Milk is marketed in the CAMMA pursuant to Federal Milk Marketing Order 131, which establishes through a statutory and regulatory scheme three classes of milk and the minimum price to be paid to producers for each class. See 7 U.S.C. Sec. 601 et seq. (1982); 7 C.F.R. Part 1131 (1984). Both plaintiffs and UDA are termed "producers" under the USDA's regulations. 7 C.F.R. Sec. 1131.12 (1984). Their milk is sold to handlers for processing. 7 C.F.R. Secs. 1131.7, 1131.9 (1984). Producers receive a "blend price" for milk marketed pursuant to Order 131. The blend price is a weighted average of the prices for the three classes of milk
 
 
 [3]
 UDA's base plan was a means of countering the incentive for overproduction provided by the combined effect of a guaranteed minimum price and the small impact an individual farmer's production has on the cooperative's total output. Rather than allocating the blend price according to the amount shipped per month by each member, UDA pays the Order 131 blend price only for the amount of base allocated to the member. Amounts produced in excess of the member's base are paid for at a lower rate. Thus, the member's "personal blend price" falls as his or her production over base increases. This arrangement is lawful under 7 U.S.C. Sec. 608c(5)(F) (1982)
 
 
 [4]
 Plaintiffs do not raise on appeal the allegations regarding the purchase of other producer-handlers and the refusal to process the milk of others
 
 
 [5]
 We thus need not address at this stage whether the UDA's actions may be legal pursuant to the Capper-Volstead Act, 7 U.S.C. Secs. 291-292 (1982)
 
 
 [6]
 Because we reverse on other grounds, we do not reach the LaSalvias' argument that the speculative damages doctrine, see Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971), applies to their refusal to deal claims