727 F.Supp. 564 (1989)
In re AIR PASSENGER COMPUTER RESERVATION SYSTEMS.
USAIR, INC., Pacific Southwest Airlines, Inc., Aircal, Inc., Ozark Air Lines, Inc., Republic Airlines, Inc., Muse Air Corporation, Alaska Airlines, Inc., Midway Airlines, Inc., Northwest Airlines, Inc., and Western Airlines, Inc., Plaintiffs,
v.
AMERICAN AIRLINES, INC., and United Air Lines, Inc., Defendants.
No. MDL 667-ER. Nos. CV 84-8918-ER(Tx), CV 89-0696-ER(Mcx) and CV 86-0697-ER(Mcx).
United States District Court, C.D. California.
December 15, 1989.
*565 Maxwell M. Blecher, Norman Pine, Beverly S. Tillett, Ann I. Jones, Blecher & Collins, P.C., Los Angeles, Cal., for plaintiffs.
Robert E. Cooper, J. Edd Stepp, Jr., Steven C. McCracken, Gibson, Dunn & Crutcher, Los Angeles, Cal., for American Airlines.
Robert B. Owen, Wm. D. Iverson, Wm. E. O'Brian, Jay T. Smith, Covington & Burling, Washington, D.C., Ralph Zarefsky, McCutchen, Black, Verleger & Shea, Los Angeles, Cal., for United Airlines.

MEMORANDUM OPINION AND ORDER
RAFEEDIE, District Judge.
The plaintiffs, a group of ten airlines ("USAir plaintiffs"), filed this antitrust action against defendants United Airlines ("United") and American Airlines ("American"), claiming damages from monopolization or attempted monopolization by each defendant of the Computer Reservations Systems ("CRS") industry. The case was filed five years ago, and a number of the substantive claims were dismissed or narrowed on summary judgment motions. See, In Re Air Passenger Computer Reservations Systems Antitrust Litigation, 694 F.Supp. 1443 (C.D.Cal.1988) [hereinafter In re CRS].
Prior to the pretrial conference, the defendants brought a motion challenging the plaintiffs' standing to bring either the monopolization or attempted monopolization claims. This Court ruled that the plaintiffs had standing to bring the monopolization claim under Section 2 of the Sherman Act as consumers of CRS services, and that they did not have standing to bring the attempted monopolization claims.
After the commencement of the trial, the USAir plaintiffs brought a motion to reconsider the Court's ruling that they lack standing to bring the attempted monopolization claims based on the Ninth Circuit's publication of an opinion in R.C. Dick Geothermal Corp. v. Thermogenics, Inc., 890 F.2d 139 (9th Cir.1989).
The Court, having read and considered the papers submitted, and having reviewed its prior rulings on this issue, denies the plaintiffs' motion for reconsideration for the reasons stated in this Memorandum.

FACTUAL BACKGROUND
This case arises out of defendants' ownership of Computerized Reservation Systems. A CRS is composed of computer terminals and printers in travel agents' offices which are telephonically linked to the vendor's computer. This equipment enables the travel agent to send and receive air transportation booking information, *566 book flights and print out a ticket. These CRSs are owned by various airlines and each system contains flight information for airlines other than the vendor airline. The vendor charges the travel agent for the use of its system and they charge other airlines fees for booking air transportation through the CRS.
Defendant American owns the world's largest CRS, SABRE, used by approximately 11,226 travel agency locations in 1986, about 35.3% of locations. Defendant United's CRS, Apollo, has been the second largest CRS, used by approximately 8,187 agencies, with an estimated market share of 25.7% of all travel agency locations. The market also includes SystemOne (or SODA), originally owned by Eastern Airlines, now by Texas Air, with a market share of 16.5%; PARS, started by TWA and presently owned by TWA and plaintiff Northwest Airlines, with a market share of 13.2%; and DATAS II, owned by Delta, with a market share of 9.3%.
When the CRSs were developed in the late 1970's, travel agents paid a fee for CRS equipment rental and other services, while airlines were not charged for participating in the CRS or for bookings made through the systems. The plaintiffs contend that this was below cost predatory pricing, utilized by the defendants to illegally acquire monopoly power in the travel agent market.
The USAir plaintiffs also contend that this predatory pricing was subsidized for over seven years from incremental revenues received by the vendor airlines in the air transportation market through "biasing" the system. Biasing is the practice of displaying flight information in a way that favors the vendor airline. The travel agent inputs its client's preferences and the CRS displays, in order of desirability, the various flights. However, each system was biased, to differing degrees, so that the desirability of the vendor's flights would be artificially inflated. The defendants acknowledge that biasing existed in all CRSs, but deny that they actually achieved any incremental passenger revenues from the practice.
In the late 1970's, SABRE and Apollo began signing carriers to "cohost contracts." These contracts provided that the carrier's product would receive preferential treatment in the CRS in return for a fee paid on each booking which the carrier received through the CRS. Beginning in 1981, vendor airlines began entering into individually negotiated contracts with each airline for participation without preferential treatment, and booking fees rose from $0.25 per booking up to $3.00 per booking in some instances.
In August 1984, the Civil Aeronautics Board ("CAB") established a number of rules governing the practices of CRS vendors. Each CRS vendor is required to make available an unbiased primary display, to charge all carriers participating in its CRS the same booking fees for the same level of service, to sign travel agencies for contracts not in excess of five years duration, and to make CRS marketing data available for sale. The CAB declined to regulate booking fees. 14 C.F.R. 255.
In response to the CAB rules, American announced it would charge $1.75 per booking made through SABRE, and United charged $1.85 per booking. The three other vendors are charging similar fees. A five year travel agent contract has become standard in the industry since the announcement of the CAB rules. In addition, all the vendors' contracts with travel agents contain a liquidated damages clause which specifies that, if the travel agent breaches the contract, the agent must pay damages equal to future payments due under the contract, as well as fifty to one hundred percent of the lost revenues represented by the booking fees that the vendor airline would have collected from bookings made by the agent under the contract. In addition, these contracts contain a minimum use provision, under which the travel agent must maintain a specified level of bookings through the system, usually tied to a percentage of the first six months' usage.
The plaintiffs claim that each defendant used predatory pricing in the early years to *567 obtain a monopoly illegally, and that the current booking fees of approximately $1.75 represent a monopoly overcharge. The plaintiffs also claim that the various contract clauses constitute an unreasonable restraint on competition that are used by the defendants to illegally maintain their monopoly power. In its prior ruling, this Court held that the plaintiffs have standing as consumers of CRS services to bring a claim for damages resulting from monopoly overcharging caused by the defendants' monopolization of their respective CRSs. The question presented here is whether, as consumers of CRS services, the plaintiffs also have standing to bring an attempted monopolization claim, claiming the same damages (excessive booking fees paid) in the absence of an achieved monopoly.

THE STANDING ISSUE IS PROPERLY BEFORE THE COURT
The USAir plaintiffs argue that it is too late for the defendants to raise the issue of antitrust standing on the eve of trial, or, in the alternative, that standing is a factual issue for the jury, and should not be resolved by the Court. However, antitrust standing is "a threshold requirement," and, although technically not a jurisdictional question, is one properly raised at any stage of the litigation. R.C. Dick, 890 F.2d at 145. Further, "[t]he issue of status as a proper party in an antitrust suit is a pure question of law." Eagle v. Star-Kist Foods, Inc., 812 F.2d 538, 539 (9th Cir.1987) (cites omitted).

THE LEGAL STANDARD FOR STANDING
In Associated General Contractors of California, Inc. v. California State Council of Carpenters, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983), the Supreme Court set forth the factors which a court must consider to determine whether a plaintiff has standing to bring a case for antitrust violations. They are (1) whether the nature of the plaintiff's injury is the type the antitrust laws were intended to forestall, (2) the directness of the injury; (3) the existence of more direct victims; (4) the risk of duplicative recovery; and (5) the complexity of apportioning damages. Id. at 538-47, 103 S.Ct. at 908-13.
Plaintiffs claim that in Blue Shield of Virginia v. McCready, 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982), the Court set out a broad standard extending standing to include any beneficiaries of the competitive infrastructure who were impacted by the [antitrust] violation. However, McCready does not stand for the broad proposition claimed by plaintiffs. Even if it did, the case must be read today in conjunction with the Supreme Court's subsequent narrowing of antitrust standing in Associated General Contractors.
In McCready, the plaintiff alleged that her health insurance coverer, Blue Shield of Virginia, had conspired with psychiatrists to limit the market for psychological services by agreeing to reimburse their insureds for psychiatric treatment, but not for treatment by clinical psychologists. The plaintiff was treated by a clinical psychologist and her claim for reimbursement was denied by Blue Cross. The Supreme Court held that the market restrained was the market for psychological services, a market in which the plaintiff was not a participant. However, the injury to the plaintiff was direct enough to create antitrust standing. Id. at 476, 102 S.Ct. at 2546.
However, since the broad language of McCready, the Court redefined standing in Associated General Contractors. The Court noted that "`[a]n antitrust violation may be expected to cause ripples of harm to flow through the Nation's economy; but "despite the broad wording of § 4 there is a point beyond which the wrongdoer should not be held liable."'" Associated General Contractors, 459 U.S. at 535, 103 S.Ct. at 907 (quoting Illinois Brick Co. v. Illinois, 431 U.S. 720, 760, 97 S.Ct. 2061, 2082, 52 L.Ed.2d 707 (1977)). The Court went on to quote McCready in a light far different from that proposed by the plaintiffs: "It is reasonable to assume that Congress did not intend to allow every person tangentially affected by an antitrust violation to maintain an action to recover threefold damages for the injury to his business or property." *568 Associated General Contractors, 459 U.S. at 536, 103 S.Ct. at 908 (quoting McCready, 457 U.S. at 476-77, 102 S.Ct. at 2546-47).
The Court then defined the factors, listed above, which must be examined in order to determine standing to bring an antitrust suit, and noted, "[h]arm to the antitrust plaintiff is sufficient to satisfy the constitutional standing requirement of injury in fact, but the court must make a further determination whether the plaintiff is a proper party to bring a private antitrust action." 459 U.S. at 536 n. 31, 103 S.Ct. at 907 n. 31. The Ninth Circuit has consistently applied the factors enumerated in Associated General Contractors when determining the key issue of whether the proper party is before the court in an antitrust case. See, e.g., LaSalvia v. United Dairymen of Arizona, 804 F.2d 1113, 1115 (9th Cir.1986), cert. denied, 482 U.S. 928, 107 S.Ct. 3212, 96 L.Ed.2d 699 (1987); Exhibitors' Service, Inc. v. American Multi-Cinema, Inc., 788 F.2d 574, 578 (9th Cir.1986).
The plaintiffs' Motion for Reconsideration asserts that the Ninth Circuit, in R.C. Dick, confirmed that McCready is recognized as an independant basis for standing. However, the majority opinion in R.C. Dick, relies on the narrowing of antitrust standing under Associated General Contractors in the bulk of its standing analysis rather than on McCready. In passing, the majority merely notes that standing will still be permitted under McCready if the injury to the plaintiff is "inextricably intertwined" with the injury to competition that is alleged. R.C. Dick, 890 F.2d at 147. The dissent recognizes that the majority opinion is primarily relying on the factors elaborated in Associated General Contractors. Id. at 156 ("the majority today reads Associated General Contractors as a far-reaching decision that cuts a wide swath through pre-existing caselaw on antitrust standing. I think the majority grossly overreads Associated General Contractors"). Thus, this Court's reliance on the standing factors of Associated General Contractors falls squarely within the majority ruling in R.C. Dick.
Even assuming that the plaintiffs are correct, and McCready represents a completely separate basis for standing, the plaintiffs still would not have demonstrated standing to bring the attempted monopolization claim. In McCready, the Supreme Court found that McCready's injury (1) was actually caused by the antitrust violation, (2) was a foreseeable result of the violation, and (3) was "a necessary step in effecting the ends of the alleged illegal conspiracy." McCready, 457 U.S. at 480, 102 S.Ct. at 2549. Thus, causation is an essential element of standing, regardless of whether the Court applies McCready or Associated General Contractors. For the reasons stated below, the Court finds no direct causal connection between the defendants' alleged anticompetitive acts and the damages the plaintiffs are claiming.

DISCUSSION
The plaintiffs contend that each of the acts which evidence illegal acquisition and/or maintenance of market power also evidences the specific attempt to acquire market power. They claim that the booking fees charged to other airlines since November 1984 are exclusionary acts used to achieve market power because of their relationship to the liquidated damages clauses. Since the liquidated damages clauses in the contracts used by both defendants are tied to "lost" booking fees, the plaintiffs contend that the excessive booking fees are caused by the anticompetitive conduct  the liquidated damages clauses.
The Court has reviewed these contentions, and, as in a motion to dismiss, has taken all the contentions as if proved by the plaintiffs, drawing all reasonable inferences in their favor. However, even in this favorable light, the plaintiffs are not the proper parties to bring an action for attempted monopolization.

A. Directness of Injury

As explained by Areeda and Hovenkamp, when defendants engage in predatory pricing and other anticompetitive acts in an attempt to gain a monopoly, the competitor who is being driven out of the market is *569 the party with standing.[1] Only when the defendants achieve a monopoly and are in a position to harm consumers by engaging in monopoly overcharging, is there harm to the consumers. Thus, the government will often be the enforcer of behavior which rises to attempted monopoly. "But the most likely enforcer is the immediate victim of the illegal conduct  namely, the competitor weakened or ruined by the improper conduct." P. Areeda & H. Hovenkamp, Antitrust Law ¶ 340.2b (1988 Supplement). Similarly, "a consumer cannot obtain damages without showing that he actually paid more than the competitive level." Id. at 337.1.
A review of cases involving attempted monopolization claims always finds the same fact pattern: a competitor of the alleged attempting monopolizer who claims that the plaintiff, as a competitor, was either driven out of business or suffered reduced profits because of the anticompetitive acts of the alleged attempter. See, e.g., LaSalvia v. United Dairymen of Arizona, 804 F.2d at 1116 (as competitors of the defendant, the LaSalvias are the proper parties to challenge the defendants' anticompetitive conduct in an action for attempted monopolization); William Inglis & Sons Baking Co. v. ITT Continental Baking Co., 668 F.2d 1014 (9th Cir.1981) cert. denied 459 U.S. 825, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982) (plaintiff alleged that Continental used below-cost pricing and discriminatory pricing to drive out competitors in the market for wholesale bread, injuring one of its competitors, the plaintiff); Multiflex, Inc. v. Samuel Moore & Co., 709 F.2d 980 (5th Cir.1983), cert. denied, 465 U.S. 1100, 104 S.Ct. 1594, 80 L.Ed.2d 126 (1984) (competitor brought claim for attempted monopolization under Section 2 for acts by defendants which prevented competitor from gaining rightful market share). Compare, General Business Systems v. North Am. Philips Corp., 699 F.2d 965, 976 (9th Cir.1983) (competitor cannot bring attempted monopolization claim without a showing of predatory conduct). Thus, the predatory conduct which supports a claim for either monopolization or attempted monopolization harms competitors, but consumers are harmed by the supracompetitive rates charged by a monopolist.
However, the USAir plaintiffs are not competitors in the CRS market. This Court explicitly held that "the participating airlines are injured as consumers of CRS services by paying supracompetitive rates." In Re CRS, 694 F.Supp at 1466 (emphasis added). The Court's holding that the plaintiffs are consumers in the relevant market was the basis for finding that plaintiffs have standing to bring the monopolization claim against the defendants.
Taking as true plaintiffs' contention that the defendants charged high liquidated damages to travel agents who tried to switch to competing CRS vendors in trying to gain monopoly power, and accepting as true that the liquidated damages clauses are tied to the booking fees paid by plaintiffs, it does not follow logically that the booking fees are supracompetitive, nor does it follow that there is any causal connection between the liquidated damages clauses and the booking fees. In fact, the allegedly supracompetitive booking fees were imposed in 1984, prior to the first use of the liquidated damages clauses in 1985.
As a matter of economic theory, supracompetitive rates are the result of monopoly, not attempted monopoly. A company which charges higher than competitive fees before it achieves monopoly power is merely creating an incentive for entry into that market by new competitors, not committing an exclusionary act. A consumer has standing to sue for the damages caused by supracompetitive rates after the monopoly is achieved (or for injunctive relief before the monopoly is achieved), because "[i]njury from supracompetitive pricing is the type of injury which the antitrust laws were intended to prohibit." In re Crs, 694 F.Supp. at 1465. However, supracompetitive pricing does not result from an attempt *570 to monopolize when the monopolization is not achieved.
The plaintiffs fail to satisfy one of the factors set out in Associated General Contractors, the directness of the injury, as well as the causation requirement of McCready. Plaintiffs fail to demonstrate a direct causal connection between the alleged anticompetitive conduct (the liquidated dated damages clauses) and the alleged harm suffered by the plaintiffs (supracompetitive booking fees).

B. Presence of More Direct Victims.

As discussed above, the plaintiffs' alleged injury, supracompetitive booking fees paid to the defendants, are the type of injury which the antitrust laws are intended to compensate, but they do not flow directly from the alleged attempted monopoly. Consumers are injured from monopoly overcharging. But in an attempted monopoly claim, their potential injury is too remote and indirect.
The direct victims of an attempted monopolization claim are the competing CRS vendors.[2] "`The existence of an identifiable class of persons whose self interest would normally motivate them to vindicate the public interest in antitrust enforcement diminishes the justification for allowing a more remote party such as the [plaintiffs] to perform the office of a private attorney general.'" Eagle v. Star-Kist Foods, 812 F.2d 538, 542 (9th Cir.1987) (quoting Associated General Contractors, 459 U.S. at 542, 103 S.Ct. at 911). See also Sundance Land v. Community First Fed. Sav. & Loan, 840 F.2d 653 (9th Cir.1988) (applying factors in Associated General Contractors, plaintiff lacked standing to bring antitrust action because a more direct victim of the alleged anticompetitive activity was present, injury was indirect, and risk of duplicative damages); Lucas v. Bechtel Corp., 800 F.2d 839 (9th Cir.1986) (applying factors in Associated General Contractors, plaintiff lacked standing to bring antitrust action because a more direct victim of the alleged anticompetitive activity was present, injury was indirect).
Therefore, under the standard of Associated General Contractors as interpreted by the Ninth Circuit, the USAir plaintiffs lack standing to bring the attempted monopolization claim. The harm alleged, supracompetitive booking fees paid, do not result from an attempt to monopolize nor are they caused by the specific anticompetitive act alleged (liquidated damages clauses). There are more direct victims of the alleged antitrust violations who are the proper parties to bring the claim  the competitors in the CRS market. Therefore, the plaintiffs' motion for reconsideration is denied.
NOTES
[1] Of course, consumers can be injured by acts such as a Section 1 conspiracy between two suppliers to fix prices at an artificially high level, even though monopolization was not achieved. But there are no Section 1 conspiracy claims remaining in this case.
[2] In fact, there is a case presently pending in Texas in which a CRS competitor is suing American and United.