890 F.2d 139
 58 USLW 2277, 1989-2 Trade Cases 68,828
 R.C. DICK GEOTHERMAL CORP., a corporation, Plaintiff-Appellant,
v.
THERMOGENICS, INC., a corporation; Pacific Energy Corp., a
corporation; Resources Investment Co., a corporation;
Hughes Aircraft Co., a corporation; Callon Petroleum Co., a
corporation; Geothermal Resources International, Inc., a
corporation; L.A. Hyland; Robert S. Reed; and John S.
Callon, Defendants-Appellees.
 Nos. 85-2573, 85-2589.
 United States Court of Appeals,
Ninth Circuit.
 Argued En Banc and Submitted
May 12, 1988.
Decided Oct. 24, 1989.
 
 C. Douglas Floyd and Allan N. Littman, San Francisco, Cal., for plaintiff-appellant.
 James L. Hunt, San Francisco, Cal., for defendants-appellees.
 Appeals from the United States District Court for the Northern District of California.
 Before GOODWIN, BROWNING, ALARCON, NORRIS, BEEZER, WIGGINS, BRUNETTI, KOZINSKI, NOONAN, THOMPSON, and O'SCANNLAIN, Circuit Judges.
 NOONAN, Circuit Judge:
 
 
 1
 The plaintiff in this case, the lessor of property producing geothermal steam, brought suit under the antitrust laws of the United States against its lessees. After a trial on one set of claims and after giving summary judgment on another, the district court entered judgment for the defendants. We affirm the district court.
 
 BACKGROUND FACTS
 
 2
 Drawing on the opinion of the district court, R.C. Dick Geothermal Corp. v. Thermogenics, Inc., 619 F.Supp. 441 (N.D.Cal.1985), aff'd, 827 F.2d 407 (9th Cir.1987), withdrawn, vacated, rehearing granted en banc, 841 F.2d 1010 (9th Cir.1988), undisputed facts set out in the briefs of the parties, and information in the public domain, we summarize the facts as follows:
 
 
 3
 The Products.
 
 
 4
 Water heated by the earth's energy--geothermal steam--is the primary product in play. Its major use in this country has been for one purpose, the production of electricity, and at one place, The Geysers, 378,000 acres in Sonoma and Lake Counties, Northern California. The user, until very recently, has been one company, the Pacific Gas and Electric Company (PG & E), which since the 1950's has taken the lead in the use of geothermal power to produce electricity and which was the sole purchaser of geothermal steam in the period 1970-1983.
 
 
 5
 The Geysers are a mountainous terrain, marked not by actual geysers but by fumaroles, small openings in porous rock from which white puffs of condensed steam emerge. At levels as great as 10,000 feet beneath this surface a reservoir of heated water, 13.3 miles by 5.3 miles, exists. R.C. Dick, 619 F.Supp. at 447 n. 4. The immediate source of the heat is believed to be magmatic rock at about 32,800 feet. Id. The ultimate source of the heat is most likely volcanic activity. Handbook of Geothermal Energy 93 (L. Edwards et al., eds. 1982).
 
 
 6
 The water trapped in the reservoir is a depletable resource. There is little recharge after use as steam. R. Denlinger, Geography and The Geysers Geothermal Field, Northern California p. III (Doctoral dissertation, Stanford University, 1979). Individual wells are exhausted by use. P. Kruger and C. Ote, Geothermal Energy 135 (1973); and a whole geothermal field declines as it is used. H.C. Armstead, Geothermal Energy 66 (2nd ed. 1983).
 
 
 7
 The value of geothermal steam has depended on the willingness of a supplier of electricity to use it. In 1960, after experiments in the 1950's, PG & E opened its first power plant using such steam, Unit 1, with a generating capacity of 12 million watts (12 megawatts). The producer of steam was the Magma-Thermal Power Co. A Reservoir Assessment of The Geysers Geothermal Field 8 (Pub. No. TR 27 of the California Department of Corrections, Division of Oil and Gas, 1981).
 
 
 8
 In 1963, PG & E opened Unit No. 2, capable of generating 14 megawatts, with Magma-Thermal Power Co. as the producer. Id. From 1967 until June 1979, the Union Oil Company of California, in association with Magma-Thermal or alone, was the only producer of steam in The Geysers, while PG & E remained the only buyer. Id. By the end of 1973, PG & E had built plants with a capacity of 410 megawatts. Id.
 
 
 9
 The development of more PG & E plants was retarded by the difficulty of meeting environmental controls and licensing requirements. P. Kruger et al., "Utility Industry Estimates of 'Geothermal Electricity', Geothermal Resources Council, Transactions (September 1980) vol. 4, p. 512." There was an accompanying increase in the cost of the power plants designed to deal with the environmental problems, especially the treatment of odiferous H2 S. A capital cost of $12.8 million to construct two plants with a total capacity of 110 megawatts in 1971 rose in 1979 to a capital cost of $25.5 million to construct a single plant, Unit No. 15 with a capacity of 55 megawatts. H.C. Armstead,supra, at 298. In the 1970's it was estimated that there was a five-year time lag in The Geysers between drilling that confirmed the existence of usable steam wells and commercial operation of a power plant. Kruger and Ote, supra, at 135. The wells and the plants had to be close to each other because geothermal heat loses its energy quickly in being transported from the wellheads to the plants. Id. 130.
 
 
 10
 In June 1979 PG & E's Unit No. 15 went on line, its steam being supplied by a defendant in this case. In May 1980 Aminoil USA Inc. began to supply steam to a PG & E unit with a capacity of 135 megawatts. By 1982 Aminoil, Shell Oil Co., MCR Geothermal Corp., and Occidental Geothermal all had active projects to develop wells and sell steam in The Geysers. A Reservoir Assessment, 8. In addition, Occidental Geothermal planned to become a user of steam. Id. As of 1983 PG & E was still the only actual purchaser of steam; by 1985 five other utilities were also in the market. R.C. Dick, 619 F.Supp. at 455.
 
 
 11
 Megawatt output increased from 78 megawatts in 1970 to 396 in 1973, 980 in 1980, and 1310 megawatts in 1983. The field's eventual capacity is estimated not to exceed 2,300 megawatts. Id.
 
 
 12
 The Parties.
 
 
 13
 In 1964 Ronald C. Dick, an individual, entered into a mining lease for 1,100 acres of land in Sonoma County, California, owned by Alex and Audrey Rorabaugh. He immediately assigned the lease to R.C. Dick Mercury Mines Corporation (Dick Mines), his then wholly-owned company. As the lessee of the property, Dick Mines was entitled to explore and mine all minerals including steam. For two and one half years as lessee of the Rorabaughs' property, Dick Mines drilled no wells and made no geological explorations.
 
 
 14
 In October 1966 Dick Mines subleased to Geothermal Resources Inc. (GRI). The lease provided that GRI would pay Dick Mines $14,000; that it would pay the Rorabaughs a basic minimum rental of $1,500 per month, the rental required by the master lease; a royalty of 7 percent of the gross proceeds, as required by the master lease, to the Rorabaughs; and an additional 3 percent to Dick Mines. Additionally, GRI agreed to pay the portion of the real and personal property taxes in excess of $2,500 and to pay for general public liability insurance, for worker's compensation insurance and at least $1,000 for fire insurance. The lease was to be in force for two years and thereafter up to June 30, 2063 as long as the premises produced steam in commercial quantities or GRI in good faith continued to conduct drilling on the property. If steam was discovered in commercial quantity, Dick Mines agreed to exercise its option to renew the master lease for 84 years.
 
 
 15
 In 1970, GRI transferred its steam rights to Resources Investment Company (RIC), a wholly-owned subsidiary of Hughes Aircraft Company (HAC). GRI retained a royalty interest. In 1971 R.C. Dick Geothermal Corporation (Dick Geothermal), the plaintiff in this case, was organized as a wholly-owned subsidiary of Dick Mines. The lease from the Rorabaughs was transferred to Dick Geothermal.
 
 
 16
 As of 1971 the Rorabaughs were leasing to Dick, whose interest had passed to Dick Mines and then to Dick Geothermal, while GRI and then RIC were the sublessees. Thermogenics, Inc. (TGI), another wholly-owned subsidiary of HAC, and Pacific Energy Corporation (PEC) assumed the development rights held by RIC. The companies used by the sublessees in connection with development of the property were PEC and Callon Petroleum Company, both companies owned by John Callon.
 
 
 17
 On July 12, 1973 PEC entered into a contract with PG & E. PG & E agreed to construct a power unit (Unit 15) of about 55 megawatts full capability. PEC agreed to provide the steam for this unit and in addition to carry out exploration and development of the property to "define as quickly as practicable the total steam reserves" of the property. PEC further agreed to conduct sufficient drilling to support installation of additional capacity at a rate of at least 100 megawatts per year. The price PG & E was to pay was calculated in terms of a ratio derived from PG & E's costs in using fossil fuels and nuclear fuels but in no event was to be less than 2 mills per kilowatt hour of net output. PG & E was given the right to terminate if costs or the quality of steam made the unit economically impracticable. PEC was given the right to terminate if the operation of the wells became unprofitable. Otherwise no termination date was set.
 
 
 18
 In 1979 Dick Geothermal bought the fee from the Rorabaughs, securing for itself the Rorabaugh's 7 percent royalty interest.
 
 
 19
 In the case at bar the defendants are the sublessees--GRI and HAC and HAC's subsidiaries, TGI and RIC; Callon and his companies, PEC and Callon Petroleum; and certain individual officers of the defendants. The defendants, in short, either held leases to the property or worked for these leaseholders. Dick Geothermal related to the defendants as their only landlord in and after 1979 and as their intermediary landlord before 1979.
 
 The history may be summarized as follows:
 PRE-CONSPIRACY
 
 20
 1964 Ronald C. Dick leases from Rorabaughs.
 
 
 21
 1964 Ronald C. Dick assigns lease to Dick Mines.
 
 
 22
 1964-1966 Dick Mines drills no wells.
 
 
 23
 1966 Dick Mines subleases to GRI.
 
 AFTER ALLEGED CONSPIRACY BEGAN IN 1970
 
 24
 1970 GRI transfers its steam rights to RIC.
 
 
 25
 1971 Dick Mines transfers its lease to Dick Geothermal.
 
 
 26
 1971 RIC transfers its rights to TGI and PEC.
 
 
 27
 1973 PEC contracts with PG & E, and PG & E agrees to build a 55 megawatt plant.
 
 
 28
 1/79 Rorabaughs sell fee to Dick Geothermal.
 
 
 29
 6/79 Unit 15 of PG & E begins using steam from the property.
 
 
 30
 12/79 Complaint filed by Dick Geothermal.
 
 
 31
 (Alleged conspirators are in italics)
 
 
 32
 The Markets.
 
 
 33
 As the plaintiff presented its case, and as the district court conceptualized it, there were two markets. One was the market in which there were buyers and sellers of steam. The other was the market in which there were buyers and sellers of rights in steam-producing property. The geographic boundaries of these markets was disputed. The resolution of the dispute is a question of law. Ron Tonkin Gran Turismo, Inc. v. Fiat Distributors, Inc., 637 F.2d 1376, 1387-88 (9th Cir.), cert. denied, 454 U.S. 831, 102 S.Ct. 128, 70 L.Ed.2d 109 (1981). The district court determined on summary judgment that the geographic boundaries of the markets for steam and for properties producing steam was the entire 378,500 acres of The Geysers. R.C. Dick, 619 F.Supp. at 447. We review that determination de novo. United States v. McConney, 728 F.2d 1195, 1202-04 (9th Cir.), cert. denied, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).
 
 
 34
 The burden of proof in establishing a market for antitrust purposes is on the plaintiff. Gough v. Rossmoor, 585 F.2d 381, 389 (9th Cir.1978), cert. denied, 440 U.S. 936, 99 S.Ct. 1280, 59 L.Ed.2d 494 (1979). The district court had before it evidence showing where there were buyers and sellers of steam and steam rights. In opposing defendants' motion for summary judgment on the Section Two claim, Dick Geothermal argued: "Plaintiff's property and the surrounding buildable property within 1 to 2 miles of the existing and potential steam well heads is the relevant geographic market. Central to the analysis of any relevant geographic market issue in this case is the fact that geothermal steam cannot be transported for more than 1 to 2 miles." Dick Geothermal also presented an alternative definition in terms of the power plants of PG & E: it argued that the market should include "only those geothermal wells situated within two miles of a steam generating unit and not otherwise committed to a buyer." R.C. Dick, 619 F.Supp. at 447; see also id. at 447 n. 3.
 
 
 35
 We are unable to see how the geographic markets contended for by Dick Geothermal in the district court made sense. By Dick Geothermal's own account PG & E would construct power plants where there was steam. No transportation problems limited the creation of these new plants because the plants were put up where the steam was found. Dick Geothermal's first argument appeared to define the geographic boundaries in terms of distance from its own property. But steam from its land was only a small portion of the product. Wherever there were potential wellheads, steam could be produced. Dick Geothermal's second argument--the one pressed upon the district court--assumed that the number of power plants was static. But, taking into account its own costs and profits, PG & E built power plants as sufficient steam to support them was discovered and came into production. Steam and steam-producing lands were not static, nor was the number of power plants fixed. Dick Geothermal did not carry its burden of proving its definition of the markets. We accept the determination of the district court that the geographic boundaries of the markets for steam and for properties producing steam was the entire 378,500 acres of The Geysers. R.C. Dick, 619 F.Supp. at 447.
 
 
 36
 The Suit.
 
 
 37
 Dick Geothermal sued the defendants under Sections One and Two of the Sherman Act, 15 U.S.C. Secs. 1-2 (1988). Dick Geothermal's theory of how the defendants had injured it by violating Section One was that they had conspired to conceal the steam capacity of the property they had subleased from Dick Geothermal, thereby preventing Dick Geothermal from assuming control of the property's development for its own account. Dick Geothermal also contended that the conspiracy, by reducing the steam production, had necessarily reduced Dick Geothermal's revenue from royalties. These asserted injuries affected Dick Geothermal not as an actual but as a potential supplier of steam.
 
 
 38
 The alleged Section One violations also had an asserted impact on the steam rights market. According to Dick Geothermal's theory, a signal was conveyed by the defendants' conspiratorial non-production of steam to companies interested in buying steam-producing lands; the signal was that the land adjacent to the Dick Geothermal property was of low quality because the Dick Geothermal property was producing so little. Not only was competition for these adjoining lands discouraged, but, so Dick Geothermal complained, Dick Geothermal itself was deprived of the information and the revenues with which it could have competed vigorously as a buyer in the steam rights market. The conspirators were portrayed as so intent on their objectives that they were willing to forego the 90% of the steam royalties that would have gone to them in order to deprive Dick Geothermal of its 10% share.
 
 
 39
 Under Section Two of the Sherman Act, Dick Geothermal alleged that the defendants had attempted to monopolize the steam market and had conspired to monopolize that market.
 
 
 40
 The district court simplified the case by severing for trial the issue of whether the plaintiff could show any anticompetitive effect of the alleged conspiracy on the market for steam. R.C. Dick, 619 F.Supp. at 450. After trial, the court found no anti-competitive effects and so no violation of Section One. Id. at 462-63. The district court also granted summary judgment for the defendants on the plaintiff's claim that the defendants had restrained competition in the market for steam rights. Id. at 450. The court found there was uncontroverted evidence that throughout the relevant period there was active competition for steam rights within the relevant market and that the plaintiff had provided no support for its contention that the defendants' conduct had affected this market. Id. at 451-52.
 
 
 41
 On the Section Two claims, the court granted summary judgment for the defendants. Id. at 463. As to the claim of attempted monopolization of the steam market, the district court found that the plaintiff could not prove that the defendants had market power or that they had engaged in anticompetitive conduct. Id. As to the conspiracy to monopolize prong of the Section Two claim, the district court found that the plaintiff had offered no proof of specific intent to monopolize. Id.
 
 
 42
 Only the Section One issues were appealed. A panel of this court affirmed the district court. R.C. Dick Geothermal Corp. v. Thermogenics, Inc., 827 F.2d 407 (9th Cir.1987). We then took the case en banc, 841 F.2d 1010 (9th Cir.1988).
 
 ANALYSIS
 
 43
 Before reaching the issues addressed by the district court and the panel we ask whether the plaintiff has standing to bring an antitrust suit against these defendants. In other words, is the injury it seeks to redress one which the antitrust laws are "intended to prevent"? Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). Although this question looks at "a threshold requirement," it is not a jurisdictional question but one properly raised at any stage of the litigation. Whenever it appears that this part of the plaintiff's case has not been established and has not been conceded, an element necessary for the plaintiff to prevail is lacking. P. Areeda & H. Hovenkamp, Antitrust Law p 335.1b (Supp.1987).
 
 
 44
 The dissent suggests that as standing was not an issue at trial we should not decide it. But the dissent's position undercuts the established rule that standing is open to challenge at any time. The dissent's position, moreover, raises an issue not raised by the appellant in its Supplementary Brief on Standing. The appellant did not contend that standing could not be determined on the record before us. Rather, confidently invoking what it said had been the law of this circuit "for over 30 years," it joined issue on the question of standing as presented by the record. Any objection based on the inadequacy of the record has been waived.
 
 
 45
 Black letter law teaches that we may decide a case on any basis fairly presented in the record. While the district court did not decide the issue of antitrust standing, that court made factual findings and rulings as to what was disputed, and these findings and rulings permit a decision as to standing. In the trial on the anti-competitive effects on the steam market, the court made factual findings reviewable under the clearly erroneous standard. Dollar Rent A Car of Washington, Inc. v. Travelers Indemnity Co., 774 F.2d 1371, 1374 (9th Cir.1985). In its granting of summary judgment on the steam rights market, the district court ruled that there was no factual dispute as to certain matters; these rulings are reviewed de novo here. Darring v. Kincheloe, 783 F.2d 874, 876 (9th Cir.1986). Holding that the factual findings were not clearly erroneous and that there is no factual dispute as to the summary judgment rulings, we have a record on the basis of which we address de novo the issue of standing. Bubar v. Ampco Foods, Inc., 752 F.2d 445, 449 (9th Cir.), cert. denied, 472 U.S. 1018, 105 S.Ct. 3481, 87 L.Ed.2d 616 (1985); Angle v. United States, 709 F.2d 570, 573 (9th Cir.1983).
 
 
 46
 The doctrine of antitrust standing "requires an inquiry beyond that performed to determine standing in a constitutional sense." Bubar, 752 F.2d 448. If standing is not found, an essential element of the plaintiff's case is missing and the plaintiff's case fails. To score a home run the plaintiff must first have touched first base.
 
 
 47
 In response to this court's request for briefing Dick Geothermal argued that its standing as a royalty owner was decided by Mulvey v. Samuel Goldwyn Productions, 433 F.2d 1073 (9th Cir.1970), cert. denied, 402 U.S. 923, 91 S.Ct. 1377, 28 L.Ed.2d 662 (1971) and Steiner v. 20th Century-Fox Film Corp., 232 F.2d 190 (9th Cir.1956). The rule of Mulvey and Steiner, however, was formulated at a time when the Supreme Court had not defined what were the appropriate restrictions on standing. California State Council v. Associated General Contractors, 648 F.2d 527, 537, n. 15 (9th Cir.1980), rev'd, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). At the time that this court formulated its rule we were willing to grant standing if the plaintiff was in "the target area," that is, within the economic area endangered by a breakdown of competitive conditions in a particular industry. 648 F.2d at 537-38.
 
 
 48
 The "target area" approach was explicitly rejected by Associated General Contractors. 459 U.S. at 536 n. 33, 103 S.Ct. 907 n. 33. The dissent finds Associated General Contractors "an unremarkable decision." But the decision is controlling as to the kind of analysis that must be undertaken here. Following Associated General Contractors we can no longer apply Steiner and Mulvey: their method of analysis is no longer good law.
 
 
 49
 Rejection of Steiner and Mulvey, so Dick Geothermal contends, is a rejection of thirty years of antitrust law in this circuit. That rejection was accomplished not by this case but by Associated General Contractors when it rejected target area analysis. See, e.g., Note, "Antitrust Standing, Antitrust Injury and the Per Se Standard," 93 Yale L.J. 1309, 1327 (1984). We cannot, of course, say what the results would have been in Steiner and Mulvey if the alternative approach approved by Associated General Contractors had been taken, for that kind of analysis was not done in Steiner and Mulvey. What we can say is that after Associated General Contractors a landlord or receiver of royalties does not establish antitrust standing by showing its receipts are down and it is in the area where an antitrust violation produced this result.
 
 
 50
 The Supreme Court in Associated General Contractors made clear that Sec. 4 of the Clayton Act is not to be read literally so that "any person" who was injured "by reason of anything forbidden by the antitrust laws" could maintain an action. Id. at 535, 103 S.Ct. 907. What is crucial in interpreting this statute, as in interpreting any statute, is to determine congressional purpose. If Congress did not intend to protect the interest asserted by the plaintiff, the statute simply does not apply. No doubt in the divination of congressional intent a court is compelled to determine the policies Congress had in mind. But congressional intent, once ascertained, is not just another policy. Whether Congress intended to confer standing is decisive. Id. at 530-35, 103 S.Ct. at 904-07.
 
 
 51
 To determine whether the plaintiff's case falls within the intended area of statutory protection, we must "evaluate the plaintiff's harm, the alleged wrongdoing by the defendants and the relationship between them." Id. at 535, 103 S.Ct. at 907. In undertaking this evaluation several factors have been set out by the Supreme Court as factors which may be "controlling." Id. at 538, 103 S.Ct. at 908. They include:
 
 
 52
 1. The specific intent of the alleged conspirators;
 
 
 53
 2. The directness of the injury;
 
 
 54
 3. The character of the damages, including the risk of duplicative recovery, the complexity of apportionment, and their speculative character;
 
 
 55
 4. The existence of other, more appropriate plaintiffs;
 
 
 56
 5. The nature of the plaintiff's claimed injury. Id. at 537-45, 103 S.Ct. at 912.
 
 
 57
 No single factor is decisive. The court must balance the factors. Los Angeles Memorial Coliseum Commission v. NFL, 791 F.2d 1356, 1363 (9th Cir.1986), cert. denied sub nom., Los Angeles Raiders v. NFL, 484 U.S. 826, 108 S.Ct. 92, 98 L.Ed.2d 53 (1987). We review the factors in turn as they apply here.
 
 
 58
 Dick Geothermal argues that the factor of intent is in its favor. In its complaint Dick Geothermal alleged that the defendants had acted intentionally to deprive it of revenues and to coerce it into selling its property for an inadequate consideration. These allegations were not tried. We assume on this appeal that they were true. An allegation of intentional injury is not "a panacea that will enable any complaint to withstand a motion to dismiss." Associated General Contractors, 459 U.S. at 537, 103 S.Ct. at 908. The assertion of the intent to injure by obtaining Dick Geothermal's property is the assertion of an intention that did no harm here because the alleged plan was never carried out. While intent adds to injury, if there is no injury the intent is irrelevant. But the alleged intent to deprive Dick Geothermal of revenues remains a factor in Dick Geothermal's favor.
 
 
 59
 Dick Geothermal argues that the factor of directness is a second factor in its favor. Directness in the antitrust context means "close in the chain of causation." E.g., id. at 540, 103 S.Ct. at 909. Understood in this sense, "direct" is an appropriate description of Dick Geothermal's alleged loss of royalties. The alleged royalties lost, however, are only a fraction of Dick Geothermal's alleged damages. A substantial part of Dick Geothermal's damages are alleged to issue from the lack of royalties depriving it of revenues to compete in the two markets with the defendants. These damages must be characterized as indirect. They are like the damages of a stockholder whose corporation is injured by monopolistic activity: because the corporation is injured, the stockholder has less money to invest; nonetheless his injury is indirect, and he lacks antitrust standing. So here, the allegation that Dick Geothermal had less resources to invest is an indirect consequence of the alleged royalty loss.
 
 
 60
 A third factor is the character of the damages. To the extent Dick Geothermal claims lost royalties, these damages are not duplicative, are clearly apportionable and could be readily calculated from the following ambivalent concession made by the defendants for the purpose of simplifying the issues at trial:
 
 
 61
 Defendants strongly deny that they have, together or singly, restrained geothermal production from plaintiff's land. In fact, each engaged in the development of that land so that it now has a 55 MW power plant installed on it, Unit 15. For purposes of this motion, however, defendants will accept plaintiff's claim, even though it is totally false and utterly unsupportable, that defendants agreed to produce Unit 15 at less than full capacity, resulting in 30 MW less production than capacity. Defendants will also accept, for purposes of this motion plaintiff's equally erroneous claim that defendants knew the remainder of plaintiff's lease would produce another 60 MW of steam, yet declined to produce it. [Defendant's Memorandum of Points and Authorities in Support of Motion for Summary Judgment on "Competitive Harm" and to exclude Expert Witnesses, at 12 n. 10, CR 734.]
 
 
 62
 The defendants' concession could and presumably would be withdrawn if damages became the issue. The court would then have to determine whether by 1979 the defendants could have produced the 55 megawatts PG & E had contracted for, and the court would have to determine how much the defendants thereafter could have produced and how much of that production PG & E would have been ready and able to use. Nonetheless, in the present posture of the case, claimed lost royalties, at least on the 55 megawatt plant after June 1979, meet the test of identifiable damages.
 
 
 63
 Dick Geothermal also claims damages for having been prevented from producing steam in its own right, but there is no evidence--as will be made clear below--that Dick Geothermal would ever have produced steam. Dick Geothermal further claims lost opportunities to buy steam rights but in attempting to avoid summary judgment pointed to no evidence of damage. If Dick Geothermal's claims were true, misinformation by the defendants kept buyers out of the market. More buyers would presumably have meant higher prices, and Dick Geothermal presents its case as a buyer of steam rights, not a seller.
 
 
 64
 Dick Geothermal maintains that the misinformation prevented it from being a buyer because the misinformation affected its financing. The district court, however, found that "the uncontroverted record" showed that there was "active competition among many firms for steam rights within the relevant market" and that there was no evidence pointed to by the plaintiff that misinformation adversely affected market structure, ease of entry or the price for steam rights. R.C. Dick, 619 F.Supp. at 452. On appeal Dick Geothermal has pointed to no evidence giving rise to a factual dispute as to these findings made by the district court in the course of giving summary judgment. Reviewing these determinations de novo, we accept them. Dick Geothermal has shown no injury from misinformation by the defendants. Its allegations as to damages from this cause do not justify antitrust standing.
 
 
 65
 Dick Geothermal's only direct, identifiable damages are those of a landlord whose rent has not been paid. To give Dick Geothermal the benefit of the damage factor would amount to the tail wagging the dog. Future litigants would know that they could get closer to antitrust standing, and a possible treble recovery on a host of speculative claims, merely by alleging a few minor and identifiable damages.
 
 
 66
 A fourth factor is the existence of identifiable persons more obviously suffering antitrust injury whose self-interest would motivate them to vindicate the public interest in antitrust enforcement. E.g. In re Industrial Gas Antitrust Litig., 681 F.2d 514, 520 (7th Cir.1982), cert. denied 460 U.S. 1016, 103 S.Ct. 1261, 75 L.Ed.2d 487 (1983). A plaintiff properly enforcing the antitrust laws has been analogized to the attorney general, but this metaphor is not authorization for a posse comitatus to come to the aid of the antitrust statutes. As to the steam market, if Dick Geothermal's claims were true, PG & E suffered the more obvious antitrust injury and is in an excellent position to vindicate its own and the public's interest. As to the steam rights market, if Dick Geothermal's claims were true, sellers of steam rights suffered antitrust injury while Dick Geothermal was a buyer which profited from the lower price allegedly produced by the conspirators. The sellers are in a far better position to champion the public interest in vigorous antitrust law enforcement.
 
 
 67
 Fifth and finally, we come to the nature of the injury. This fifth factor is of "tremendous significance." Bhan v. NME Hospitals, Inc., 772 F.2d 1467, 1470 n. 3 (9th Cir.1985). Mere injury as a landlord or lessor entitled to royalties would not by itself be the kind of injury to competition that the antitrust laws are designed to prevent. "The requirement that the alleged injury be related to anticompetitive behavior requires, as a corollary, that the injured party be a participant in the same market as the alleged malefactors." Id. at 1470 (citing Associated General Contractors, 459 U.S. at 538, 539, 103 S.Ct. at 908, 909).
 
 
 68
 Dick Geothermal, as landlord of the defendants, was neither a competitor nor a consumer in the steam market. Dick Geothermal claims it was a potential seller of steam, prepared to compete in the steam market, and an actual purchaser of steam rights, competing in the steam rights market. Dick Geothermal alleges that the defendants intended to damage it as their competitor in the sale of steam by concealing the amount of steam Dick Geothermal's property, properly developed, could produce and to damage it as their competitor in the purchase of steam leases in two ways: by depriving it of revenue it could use to acquire leases and by signaling to the sources of financing for Dick Geothermal and other would-be purchasers that the lands adjacent to Dick Geothermal were of poor quality and so not suitable for investment. In the scenario sketched by Dick Geothermal the company was a Californian Jean de Florette, the victim of villains who were not only neighbors but actually on its property hiding the true steam potential. Unlike the hapless Jean, Dick Geothermal presents its injury as being inflicted by its competitors, so that the injury appears at first blush to be antitrust injury.
 
 
 69
 These claims were not conceded. They were disputed, denied and tried. From the evidence now in the record after trial on the issue of anti-competitive effects, it is clear that Dick Geothermal's allegations went beyond what it was capable of proving. In the steam market, it was not a producer of steam. Called on to show that it had standing, Dick Geothermal in its Supplementary Brief on Standing, p. 2, notes that it owned four other steam leases besides the Rorabaugh lease but points to no evidence that it was producing and marketing steam from these leases. As to the Rorabaugh property, the district court specifically found after trial that the Rorabaugh property was not an entry point for Dick Geothermal because it was "unavailable as a result of the exclusive long-term lease between the plaintiff and GRI." R.C. Dick, 619 F.Supp. at 458. This determination was without error. Dick Geothermal's lease to GRI specifically provided that if GRI discovered steam in commercial quantities, Dick Geothermal would extend the master lease, not itself become a producer. Far from preventing Dick Geothermal from developing its own property as Dick Geothermal alleged, the defendants' alleged conspiracy was the only event that might have returned the property to Dick Geothermal to develop; for, again according to Dick Geothermal, the conspiracy violated covenants made by the lessees. If there was no breach of the lease, Dick Geothermal had no way of becoming a producer of steam on the Rorabaugh property.
 
 
 70
 As for the market in steam rights, the record shows no competitive injury was done the plaintiff or anyone else. No evidence supported Dick Geothermal's contention that the conduct of the defendants in not maximizing production of the Rorabaugh property "acted as a barrier to entry within The Geysers steam rights market, even on those locations adjacent to the Dick property." R.C. Dick, 619 F.Supp. at 452. Dick Geothermal did indeed offer the testimony of experts in economics that the price of steam-producing property could be influenced by the steam production on neighboring land. But the district court did not treat, nor did it need to treat, an abstract economic theory as evidence.
 
 
 71
 In the purchase and sale of steam rights of most immediate relevance to this suit, Dick Geothermal in 1979 bought the Rorabaugh's property. As to this purchase Dick Geothermal was faced with these alternatives when it stated its position in this case: If it bought the property at its true value, then the defendants' alleged conspiracy had had no effect even on the value of the property most immediately affected. If Dick Geothermal bought the property at a bargain price because of the defendants' conspiracy, then Dick Geothermal was the beneficiary of those it claims conspired to injure it. Its allegations in its suit chose the latter alternative. According to its theory of the case, it acquired the fee to property capable of producing over 115 megawatts at a time when it was thought capable of producing only 25 megawatts. A Jean de Florette who profited from his neighbors' villainy would be a very different figure from the pitiful protagonist of Pagnol's novel. The "victim" of alleged antitrust violations that makes a killing from the alleged violations has suffered no antitrust injury.
 
 
 72
 In its complaint Dick Geothermal asserted that the defendants' conduct "reduced the value of the Property." [Complaint, at 10, p 25(d).] No dates were specified. "The Property" referred to is the Rorabaugh land. If the defendants' conduct had indeed reduced the value of "the Property" by 1979, Dick Geothermal made no showing that there was any further reduction in its value. By the end of 1979 Dick Geothermal had, according to its 1979 complaint, all the information necessary to show that the Rorabaugh land was capable of a much higher production. If there was sufficient evidence in Dick Geothermal's possession to convince a court, as the complaint asserted, there was sufficient evidence in Dick Geothermal's possession to convince a buyer or lender on the property.
 
 
 73
 Not only did the purchase of the Rorabaugh property disprove Dick Geothermal's claim of injury through being misinformed, it also showed that the alleged conspiracy had deprived it of neither the resources nor the financial backing to buy proven steam-producing land. The purchase more than doubled its royalty income. Dick Geothermal's ability to buy adjacent land was that much the greater, while the adjacent land, again according to its allegations, was also available at bargain prices. No injury was done it, if as it alleged, the prices it would have had to pay were less than they should have been.
 
 
 74
 The foregoing assumes that Dick Geothermal's allegation as to the misinformation generated by suppression is true. But the district court in summary judgment found that Dick Geothermal had failed "to provide any support" for its claim that the stipulated suppression had any anti-competitive effects on the steam rights market. R.C. Dick at 452. Reviewing this finding de novo, we hold that there is no reason to disturb it. As Judge Choy concluded for a panel composed of himself, Judge Goodwin and Judge Pregerson, the district court "correctly determined" that Dick Geothermal "failed to provide significant probative evidence" that the alleged misinformation caused a distortion in the value of steam rights on land adjacent to the Rorabaugh property. R.C. Dick Geothermal Corp. v. Thermogenics, Inc., Nos. 85-2573, 85-2589, slip op. at 29, 827 F.2d 407 (9th Cir. Mar. 16, 1987) (as amended Sept. 1, 1987).
 
 
 75
 Dick Geothermal argued on appeal that the district court erroneously overlooked or misconstrued evidence in ruling on its misinformation theory. The district court found that Dick Geothermal's expert witness, a geothermal consultant named Dr. McNitt, did not change his advice to clients because of the absence of drilling on the Rorabaugh property. R.C. Dick, 619 F.Supp. at 452. Dick Geothermal disputes this finding by pointing to Dr. McNitt's general testimony that the value of geothermal land was determined, in part, by proximity to proven resources. But Dr. McNitt did testify that the "status of the development" on the Rorabaugh property had not affected his advice, and the district court could properly rely on that more specific testimony. The district court also found that one of Dick Geothermal's competitors, Claude Jenkins of Aminoil, was not misled by the lack of drilling. Id. Dick Geothermal claims that the court based this finding on an unsworn outline of trial testimony. But Jenkins testified at deposition and it apparently was this testimony on which the district court relied. Dick Geothermal's claims are not sufficient to disturb the district court's findings made in the course of summary judgment.
 
 
 76
 Dick Geothermal was not in the steam market and Dick Geothermal suffered no identifiable injury in the steam rights market. Following applicable precedent, however, our inquiry is not complete. We must ask if any alleged injury to Dick Geothermal was "inextricably intertwined" with injury to competition in those markets. Blue Shield of Virginia v. McCready, 457 U.S. 465, 484, 102 S.Ct. 2540, 2551, 73 L.Ed.2d 149 (1982); Chelson v. Oregonian Publishing Co., 715 F.2d 1368 (9th Cir.1983). The district court held that there was no injury to competition in either market. For reasons now to be stated, we hold that the district court was not clearly erroneous as to the facts it found after trial in support of this conclusion, that the court did not err in finding no material fact in dispute as to the steam rights market, and that the court was correct in its statement of controlling law.
 
 
 77
 On appeal Dick Geothermal began its argument by asserting that it had "alleged a naked, concerted restraint on output" and that, "squarely contrary to many Supreme Court decisions," the district court had required Dick Geothermal to demonstrate the market power of the defendants. [Opening Brief at 20-21.] Dick Geothermal invoked NCAA v. Board of Regents, 468 U.S. 85, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984), which states that a limitation on output is "ordinarily condemned as a matter of law under an 'illegal per se' approach because the probability that these practices are anti-competitive is so high." Id. at 100, 104 S.Ct. at 2959.
 
 
 78
 To prove its case that there was such a restraint on output of steam Dick Geothermal relied on the statement, quoted supra, at 147, made by the defendants for the purpose of facilitating the district court's administration of the case. This concession did not include an admission of the conduct's anti-competitive effect.
 
 
 79
 If Dick Geothermal had been right in its construction of the defendants' concession, it had proved its case before the trial. The defendants had given away the ball game. The district court, to which the same argument was made as is made here, was clearly surprised by this contention. R.C. Dick, 619 F.Supp. at 458. What was the point of having a trial if a naked restriction of output that was per se illegal had already been admitted by the defendants?
 
 
 80
 Dick Geothermal misconstrued the defendants' concession. What the defendants conceded, while at the same time saying the concession was contrary to fact, was that they had "agreed" to produce 30 megawatts less production than capacity and that they knew that they could produce another 60 megawatts "yet declined to produce it" on the plaintiff's property. Counting as part of the object of the agreement the 60 megawatts they declined to produce, the defendants conceded that they had agreed not to produce 90 megawatts on this particular property. Dick Geothermal argues that the defendants conceded that they suppressed steam in the 1973-1980 period, but the concession says nothing as to the time before Unit 15 came on line. The concession is that as of the time Unit 15 came on line--that is, June 1979--the defendants did not produce all the steam they could have produced. This concession was not proof of an agreement to restrict the output of steam in The Geysers.
 
 
 81
 The kind of restriction of output which has been condemned is the output in the relevant market, not reduction in output on a single piece of property. The main supplier of steam in The Geysers was Union Oil. If PG & E wanted more steam, there was no restriction on Union Oil supplying it. There was no evidence that "output was curtailed or prices enhanced throughout an entire competitive market." See Associated General Contractors, 459 U.S. at 539 n. 40, 103 S.Ct. at 909 n. 40.
 
 
 82
 In a field in which catchwords have often been dominant there is a grave risk of applying a tag with mechanical literalness. See Broadcast Music Inc. v. CBS, 441 U.S. 1, 8-10, 99 S.Ct. 1551, 1556-57, 60 L.Ed.2d 1 (1984). That danger is acute when a restriction on supply is alleged and the plaintiff vigorously contends that the restriction is per se destructive of competition. E.g., Pacific Stationery and Printing Co. v. Northwest Wholesale Stationers, 715 F.2d 1393, 1396 (9th Cir.1983) (concerted refusal to deal held per se illegal), rev'd, 472 U.S. 284, 105 S.Ct. 2613, 86 L.Ed.2d 202 (1985); Ostrofe v. H.S. Crocker Co., Inc., 670 F.2d 1378 (9th Cir.1982) (plaintiff injured by concerted refusal to deal held to have standing although his injury did not result from the restraint on competition) vacated and remanded, 460 U.S. 1007, 103 S.Ct. 1244, 75 L.Ed.2d 475 (1983) (with instructions to reconsider in light of Associated General Contractors).
 
 
 83
 It has been broadly doubted whether the dichotomy between the rule of reason and the per se rule still exists or is helpful to analysis. E. Gellhorn, Antitrust Law and Economics 196 (3rd ed. 1987). Per se analysis has not been rejected as " 'a valid and useful tool of antitrust policy,' " Northwest Wholesale, 472 U.S. at 298, 105 S.Ct. at 2621 (quoting Broadcast Music, 441 U.S. at 8, 99 S.Ct. at 1556), but it is clear that the term is best understood as a special case of the rule of reason, applicable where experience has established that anti-competitive consequences regularly follow from the condemned practice. United States v. Topco Associates, 405 U.S. 596, 607 (1972); 7 P. Areeda & H. Hovenkamp, Antitrust Law Sec. 1509; L. Sullivan, Handbook of the Law of Antitrust 196 (1977).
 
 
 84
 In our case there was no experience as to the effect of restricting production on the property of a single producer of a product which is uniquely sold in the United States in The Geysers: geothermal steam. There was no agreement between competitors to restrict the output of steam in the market. There was no restraint binding the dominant supplier. There was a monopsonist whose policies affected both markets. There was no per se violation. The analysis of the district court in terms of the rule of reason was without flaw.
 
 
 85
 In particular, as to the market in steam, the district court found after a trial that there was a monopsonist purchaser of steam--PG & E--and that PG & E had set the price for steam from the property for the indefinite future in relationship to its other fuel costs. R.C. Dick, 619 F.Supp. at 459-60. The alleged conspiracy did not have a harmful effect on this price. Id. at 460. Dick Geothermal's supposition that the restriction of steam output by the defendants affected PG & E's other fuel costs has been found by the district court to be speculative and unproved. Id. at 462. We have no basis to overturn these findings of fact by the district court. As to the price of steam coming from the Dick property itself, the dramatic effect of the defendants' non-maximizing of production was that the price paid by the monopsonist actually went down. No injury to competition occurred where in fact the single powerful buyer controlled the price.
 
 
 86
 As to the second market in which Dick Geothermal contended there was an anti-competitive effect--the market for steam leases or steam rights--the district court granted summary judgment. The district court made a number of findings as to which there were no material facts in dispute. Among these findings were that there existed after 1973 a lively market in steam rights with such giants as Union Oil, Phillips Petroleum, Sun Oil Co., Getty Oil Co., Chevron, and Shell Oil Co. acquiring steam rights. Id. at 451. The non-maximization of production took effect only in 1979. But by 1983 there were 23 companies active as present owners of steam rights. Id. at 455 n. 15.
 
 
 87
 Dick Geothermal failed to provide testimony from a single other developer that the developer's investment decisions were in any way influenced by the defendants' level of production on the Dick Geothermal property. Id. at 453. Dick Geothermal's own purchase of the Rorabaugh property was evidence contrary to its own position. Dick Geothermal bought the fee in the belief that the property was of value for steam production. On this appeal Dick Geothermal points to no material facts in dispute that would disturb the district court's findings of fact and conclusion of law that the assumed restraint on production did not have an effect on competition in the market for steam rights.
 
 
 88
 Dick Geothermal argues that between 1973 and 1981 the Hughes defendants (TGI and PEC) owned 4.7 percent of the steam leases in The Geysers and GRI held 5 percent, and that these two figures should be added, showing that the defendants held almost 10 percent of the existing steam leases. R.C. Dick, 619 F.Supp. at 451. By themselves these figures establish nothing as to the power of the defendants to affect the price for lands producing steam. That power depended on the other buyers in the market and on the other sellers of steam leases. The buyers of steam leases in the market were not confined to those who already held steam leases, as the entry of the 23 companies shows. The sellers of steam leases in the market were not confined to those who already held steam leases because the sellers included the owners of fees such as the Rorabaughs. The behavior of the buyers was influenced by the price they could get for steam in the monopsonistic steam market and by the buyers' awareness that there was a substantial time lag between the proving of a well and the coming of a power plant into operation near the well. The behavior of the sellers was influenced by their decisions as to the rate at which they wanted to dispose of a very limited and depletable commodity, i.e. the total estimated steam capacity of The Geysers of 2,300 megawatts. Dick Geothermal's proof of market share was not proof of power to affect price.
 
 
 89
 Dick Geothermal, a non-producer of steam, produced no evidence that the conduct of the defendants, whose production of steam in June 1979 brought PG & E's Unit 15 on line, had an anti-competitive effect in the monopsonistic market for steam. Dick Geothermal, a minor purchaser of steam rights, produced no evidence that the conduct of the defendants had an anti-competitive effect on the market for steam-producing properties. Consequently, there was no injury to competition with which its own alleged injuries were interwoven. Having concluded this review of the relevant factors that determine standing and giving especial weight to the factor of antitrust injury, we hold that Dick Geothermal lacked antitrust standing.
 
 
 90
 Establishment of standing, logically, precedes the presentation of a plaintiff's case. But as the determination of standing requires an inquiry into the antitrust character of the injuries claimed and an inquiry as to whether these injuries were inextricably intertwined with injury to competition, we have necessarily addressed the findings of the district court that no injury to competition in either relevant market was shown. We have found no clear error in its findings as to the steam market made after trial and no material fact in dispute as to the steam rights market. Consequently, we affirm the district court on the separate and alternative ground that it did not err in holding that there were no anti-competitive effects caused by the defendants' conduct in either the steam or the steam rights markets in The Geysers.
 
 
 91
 AFFIRMED.
 
 
 92
 ALARCON, Circuit Judge, joined by BEEZER, Circuit Judge, concurring in the Judgment:
 
 
 93
 I concur in the judgment. R.C. Dick lacks antitrust standing. Accordingly, I would not purport to decide whether the district court was correct in holding that the defendants' conduct did not create anti-competitive effects.
 
 
 94
 WILLIAM A. NORRIS, Circuit Judge, joined by Chief Judge GOODWIN, by Circuit Judges JAMES R. BROWNING and KOZINSKI, and by Circuit Judge DAVID R. THOMPSON as to Part V, dissenting:
 
 
 95
 Two pre-trial decisions shaped this decade-long litigation between R.C. Dick Geothermal (Dick) and the defendant developers and producers of geothermal steam (appellees).[1] First, the district court failed to rule on defendants' motion to dismiss for lack of standing. Second, the court ruled as a matter of law that the alleged horizontal conspiracy by defendants to restrict the output of geothermal steam did not amount to a per se antitrust violation.[2]
 
 
 96
 As a consequence of its per se ruling, the district court imposed upon Dick the burden of proving at trial the anti-competitive impact on the geothermal steam market of defendants' conspiracy. The court found the burden not met and granted judgment for defendants. Dick appealed solely to challenge the court's adjudication of defendants' conduct under the Rule of Reason, rather than per se analysis.
 
 
 97
 Instead of deciding the issue raised on appeal, the majority now reaches out to hold that Dick lacks standing. However, because the district court did not proceed with the motion to dismiss, there is no evidence in the record, findings of fact, or holdings on the specific issue of standing. Dick was never directly challenged to demonstrate that it suffered injury for standing purposes. Standing was not raised as an issue on appeal. The issue was raised sua sponte by members of the en banc panel during argument. After argument, the panel called for supplemental briefs limited to the standing issue. Now, without the benefits of an adequate record below or post-briefing argument on this issue,[3] ] the majority concludes that Dick lacks standing.
 
 
 98
 The court need not and should not address the standing issue because the defendants have waived antitrust standing as a defense. Antitrust standing is not a jurisdictional prerequisite, and thus is subject to waiver. See National Collegiate Athletic Ass'n (NCAA) v. Board of Regents, 468 U.S. 85, 97 n. 14, 104 S.Ct. 2948, 2958, 82 L.Ed.2d 70 (1984). The majority should, but does not, address this threshold issue. Having ignored it, the majority wrongly denies Dick standing through an excessively broad interpretation of Associated General Contractors, Inc. v. California State Council of Carpenters, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 223 (1983), an excessively narrow reading of Dick's complaint, and the use of faulty and conclusory reasoning in applying the factors identified in Associated General Contractors.
 
 
 99
 I would reach the merits of Dick's appeal. Whether or not defendants have waived the standing defense, Dick has standing according to the factors set out in Associated General Contractors and clear precedent in this circuit. We do a disservice to the parties and the court when we fail to reach the merits of this dispute after the parties have spent more than ten years litigating it. On the merits, I believe the district court erred in applying Rule of Reason analysis to the defendants' alleged conspiracy. Horizontal output restrictions constitute per se violations of section 1 of the Sherman Act.[4] NCAA, 468 U.S. at 100, 104 S.Ct. at 2959. For these reasons, I dissent.
 
 
 100
 * Although appellees raised the standing issue below, the district court decided the case without addressing the contention that Dick lacked standing.[5] The issue of standing was not raised on appeal, and that seemed to be the end of the matter until it was raised sua sponte by the court during the en banc argument. Inexplicably, the majority fails to discuss the issue of waiver, while finding that the issue of inadequacy of the record on standing was waived because it was not raised by the parties. Maj. op. at 145.
 
 
 101
 Antitrust standing is not jurisdictional, but is a defense that may be waived. In NCAA, for example, the Supreme Court reached the merits of the University's antitrust claims even though it noted that, as here, the NCAA had raised standing below but did not pursue the question in the Supreme Court. NCAA, 468 U.S. at 97 n. 14, 104 S.Ct. at 2958 n. 14. Unlike the majority here, however, the Supreme Court did not feel obliged to decide standing before reaching the merits of the dispute. I would follow the lead of the Supreme Court and reach the merits of Dick's appeal. Like the NCAA, the appellees here have waived standing by not pursuing the question.
 
 II
 
 102
 Nonetheless, I discuss the standing issue because, in contrast to the Supreme Court in NCAA, the majority today reaches out for it. In my view, Dick clearly has antitrust standing.
 
 
 103
 * I start with Mulvey v. Samuel Goldwyn Productions, 433 F.2d 1073 (9th Cir.1970), cert. denied, 402 U.S. 923, 91 S.Ct. 1377, 28 L.Ed.2d 662 (1971), and Steiner v. 20th Century-Fox Film Corp., 232 F.2d 190 (9th Cir.1956), leading Ninth Circuit cases on antitrust standing. Under the law of these cases, a licensor has standing to recover damages resulting from an unlawful conspiracy by its lessee or licensee which reduces the owner's rent or royalties. Aurora Enterprises v. National Broadcasting Co., 688 F.2d 689, 692-93 (9th Cir.1982), reaffirmed Mulvey in light of the requirement of "antitrust injury" set forth in Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977), cited by the majority to test antitrust standing.
 
 
 104
 Appellees do not dispute Dick's argument that Mulvey and Steiner support antitrust standing in this case. Both they and the majority, however, dismiss the cases as overruled by Associated General Contractors.[6] Appellees' Supp. Brief on Standing, p. 14; Opinion, p. 146. I disagree with the majority's holding that Steiner and Mulvey do not survive Associated General Contractors. Indeed, Steiner and Mulvey, with their focus on whether the plaintiffs suffered close and direct injury by reason of anything forbidden in the antitrust laws, fall squarely within the approach formulated by Associated General Contractors, which addresses "the plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between them." Associated General Contractors, 459 U.S. at 535, 103 S.Ct. at 907.[7]
 
 
 105
 In Associated General Contractors, the Court denied antitrust standing to a union which claimed that an employer association had conspired with its members to restrict trade by coercing non-association members to hire only non-union contractors. The Court found that any injuries the union conceivably could have suffered were not sufficient to support antitrust standing.[8] Indeed, the Court went so far as to call into question whether the union had demonstrated an "injury-in-fact" traceable to the defendants' conduct for the purposes of Article III standing, noting that "[i]t is not clear whether the Union's interests would be served or disserved by enhanced competition in the market." Id. 459 U.S. at 539, 103 S.Ct. at 909; see Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982) (discussing requirements of Article III standing).
 
 
 106
 The Court's holding in Associated General Contractors that the union lacked antitrust standing is unremarkable. Nevertheless, the majority today reads Associated General Contractors as a far-reaching decision that cuts a wide swath through pre-existing caselaw on antitrust standing. I think the majority grossly overreads Associated General Contractors.
 
 
 107
 In Associated General Contractors, the Court identified various factors that may be relevant to the pragmatic inquiry whether a particular plaintiff should be permitted to vindicate the public interest by bringing a treble damage action under the antitrust laws. Although the majority here states that the court must balance the factors which may be "controlling," its focus is primarily on "the nature of the injury," which it labels of "tremendous significance." Of greater significance, however, is the majority's erroneous conflation of antitrust injury and antitrust standing. Antitrust injury is part of antitrust standing, but the majority appears to make injury the determinative factor, without recognizing the difference. See maj. op. at 145 (quoting a reference to antitrust injury in Brunswick, 429 U.S. at 489, 97 S.Ct. at 697, in the context of antitrust standing).
 
 
 108
 The majority suggests that it is a necessary if not sufficient condition for antitrust standing that a plaintiff's alleged injuries derive from the anticompetitive nature of the defendant's conduct. As the majority puts it, "[m]ere injury as a landlord or lessor entitled to royalties would not by itself be the kind of injury to competition that the antitrust laws are designed to prevent." Maj. op. at 148 (citing Bahn v. NME Hospitals, Inc., 772 F.2d 1467 (9th Cir.1985)). However, the panel in Bahn miscites Associated General Contractors, when it concludes that the "requirement that the alleged injury be related to anti-competitive behavior requires, as a corollary, that the injured party be a participant in the same market as the alleged malefactors." Bahn, 772 F.2d at 1470 (emphasis added). This statement does not follow from Associated General Contractors and is contrary to Blue Shield v. McCready, 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982) (patient of psychologist brought antitrust action against health insurance company and psychiatrists' organization). Using Bahn 's erroneous reading of Associated General Contractors, the majority narrowly defines "participant in the same market" to exclude Dick, by stating that "Dick Geothermal, as landlord of the defendants, was neither a competitor nor a consumer in the steam market." Maj. op. at 148. This narrow definition of who may bring suit under the antitrust laws is not required by Associated General Contractors, nor is it correct. See, e.g., Mandeville Island Farms, Inc. v. American Crystal Sugar Co., 334 U.S. 219, 236, 68 S.Ct. 996, 1006, 92 L.Ed. 1328 (1948) ("The statute does not confine its protection to consumers, or to purchasers, or to competitors, or to sellers.")
 
 
 109
 To be sure, one important factor the Court identified and analyzed in Associated General Contractors was the "nature of plaintiff's injury." However, the Court clearly did not adopt the rigid requirement that a plaintiff's injury must always stem from the anticompetitive effects of the defendant's conduct.
 
 
 110
 In my view, Mulvey survives Associated General Contractors, just as it survived Brunswick. As we have noted, Mulvey "has never been overruled and remains the law of this circuit." Aurora Enterprises, 688 F.2d at 693.
 
 
 111
 Just one year before Associated General Contractors, the Court in Blue Shield v. McCready, 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982), explicitly rejected the notion that to have antitrust standing a plaintiff must allege injuries which "reflect the anticompetitive effect" of the alleged violation. Id. at 482, 102 S.Ct. at 2550. The Court held instead that the relationship between the injuries and the violation was merely "one factor to be considered" in deciding the standing question. Id. at 483 n. 19, 102 S.Ct. at 2550 n. 19.[9] Thus, if the majority were correct in ruling that Associated General Contractors overrules Mulvey, it also must have overruled McCready. Of course, it did not overrule McCready. Indeed, Associated General Contractors cited McCready with approval. 459 U.S. at 537-38, 103 S.Ct. at 908-09.
 
 
 112
 Our own cases interpreting Associated General Contractors explicitly reject the kind of narrow and rigid application of the case that the majority adopts today. Instead, we have insisted that standing be resolved by evaluating "certain factors ... on a case-by-case basis." Los Angeles Memorial Coliseum Comm'n v. National Football League (NFL), 791 F.2d 1356, 1363 (9th Cir.1986). In NFL, as in this case, defendants argued that the "nature" and "indirectness" of plaintiff's injury precluded antitrust standing. We rejected this argument, observing:
 
 
 113
 In basing their argument upon only some of the [Associated General Contractors ] factors, [defendants] implicitly assume that a favorable finding on each and every one of the above factors is a necessary precondition to a finding of antitrust standing. We reject any such implication. Most cases will find some factors tending in favor of standing (to a greater or lesser degree), and some against (also in varying degrees), and a court may find standing if the balance of factors so instructs.
 
 
 114
 Id. (citations omitted); see also Ostrofe v. H.S. Crocker Co., 740 F.2d 739, 741 (9th Cir.1984) (noting that Associated General Contractors did not "announce a new test for determining whether a party injured by an antitrust violation could recover treble damages").
 
 B
 
 115
 Not only does the majority misread Associated General Contractors, the majority misapplies the Associated General Contractors' test to Dick's alleged facts.
 
 1. Intent to Harm
 
 116
 It is clear that an allegation of improper motivation may help a plaintiff establish standing. Here, for the limited purpose of the trial on competitive impact, defendants stipulated that a conspiracy existed. Also, Dick specifically has alleged that appellees conspired with the intent to injure Dick's business and property and that the specific goal of the conspiracy--suppression of steam output with resulting harm--occurred. The majority asserts the intention "did no harm" because the plan was never carried out. Clearly, however, because Dick earned royalties on the output of steam, Dick was deprived of revenues as a result of the suppressed output. What the majority seems to mean is that the plan did not succeed in coercing Dick into selling his property to the defendants for inadequate consideration. However, "plaintiff need not 'prove an actual lessening of competition in order to recover. [C]ompetitors may be able to prove antitrust injury before they actually are driven from the market and competition is thereby lessened.' " McCready, 457 U.S. at 482, 102 S.Ct. at 2550 (quoting Brunswick, 429 U.S. at 489 n. 14, 97 S.Ct. at 697-98 n. 14); Thus, this factor clearly weighs in favor of Dick's standing.
 
 2. Directness of the Injury
 
 117
 Another factor affecting standing is the proximity of the injury to the defendants' conduct. Associated General Contractors, 459 U.S. at 540, 103 S.Ct. at 910. In denying standing to the union in that case, the Court declared the "chain of causation" to consist of "somewhat vaguely defined links." Id. The Court stated that "any such injuries were only an indirect result of whatever harm may have been suffered by 'certain' construction contractors and subcontractors." Id. 459 U.S. at 541, 103 S.Ct. at 910.
 
 
 118
 In the present case, however, as the majority correctly recognizes, Dick's alleged injuries of lost royalties and devaluation of its property are all the direct, foreseeable and indeed intended results of the appellees' alleged restraint of trade. Maj. op. at 146. The chain of causation is clear. There are no actors between Dick and the appellees through whom Dick's injuries have passed.
 
 
 119
 However, the majority suggests that the lost royalties "are only a fraction of Dick Geothermal's alleged damages" and that other damages are remote consequences of the lost royalties. Maj. op. at 146-147. This suggestion ignores the alleged direct loss of value to Dick's property. In fact, Dick claims that the appellees attempted to buy his property at an artificially low price. See First Amended Complaint at p 24(c). These injuries are not remote and support Dick's standing.
 
 3. The Speculative Nature of the Injuries
 
 120
 Associated General Contractors also focused upon the speculative nature of the harms allegedly suffered. Noting that the plaintiff union had not alleged that the number of union members or the amount of union revenues had declined, the Court concluded that "nothing but speculation informs the Union's claim of injury." 459 U.S. at 543, 103 S.Ct. at 911. Here, Dick's injuries--loss of royalties and property devaluation--are hardly speculative.
 
 
 121
 The majority concedes that the lost royalties meet the test of identifiable damages. But it totally mischaracterizes Dick's complaint in stating that Dick's "only direct, identifiable damages are those of a landlord whose rent has not been paid." Maj. op. at 148. Dick has alleged that it was prevented from purchasing steam leases. Without evidence on whether or not defendant's behavior produced this result, we cannot conclude as a matter of law that Dick was not injured by any alleged misinformation or that the damages are speculative.
 
 
 122
 4. The Existence of an Identifiable Class of Better Plaintiffs
 
 
 123
 An additional factor to be considered is the existence or non-existence of "an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement." Associated General Contractors, 459 U.S. at 542, 103 S.Ct. at 910. The majority identifies two classes of potential plaintiffs, Pacific Gas & Electric (P.G. & E.) and neighboring landowners, who obviate the need to confer standing on Dick. To my mind, careful reading of Dick's allegations show that it is a member of one of the majority's "identifiable classes." Dick's injury is no more "remote" than that of P.G. & E. or neighboring landowners. Moreover, I question the wisdom of denying antitrust standing to Dick with the expectation that a large, regulated utility such as P.G. & E., which can pass on most costs to consumers, will have sufficient motivation to sue appellees for violation of antitrust laws. I conclude that this factor also supports Dick's standing.
 
 5. Nature of the Injury
 
 124
 Dick claims appellees sought to deny it the resources necessary to enter the steam production market and to compete effectively in the market for steam leases. This is exactly the kind of harm to competition that the antitrust regime seeks to prevent and remedy. Appellees and the majority refute this claim only by ignoring Dick's allegations.
 
 
 125
 With very little discussion, the opinion wrongly finds that injury in the form of reduced royalties is insufficient to support standing. Maj. op. at 148. As for Dick's claimed injuries as a potential seller of steam and as an actual purchaser of steam rights, competing in the steam rights market, the majority states:
 
 
 126
 These claims were not conceded. They were disputed and denied and tried ... it is clear that [R.C. Dick's] allegations went beyond what it was capable of proving. In the steam market, it was not a producer of steam.
 
 
 127
 Maj. op. at 148. With regard to the steam rights market, the majority makes a finding of no injury to Dick. It does this based upon a further finding that the record fails to provide any admissible evidence that the defendants' alleged conspiracy had any anti-competitive effect on the steam rights market. Maj. op. at 148-49. However, these are two entirely different questions. The district court tried only the issue of anti-competitive effect on the steam market and did not litigate the issue of injury to Dick.
 
 
 128
 Here, I must express my concern regarding the procedural posture of the case. In fact, these claims--whether Dick suffered injuries in the steam rights market or as a producer of steam--were not tried or challenged by a motion for summary judgment. Dick was never required to present evidence that it had been injured in the steam rights market, that is, that defendants' conspiracy prevented Dick from purchasing adjacent property by limiting revenues and scaring away financial backers or joint venturers. Similarly, Dick was never required to present evidence that it was a competitor in the steam market.
 
 
 129
 The majority nonetheless finds facts on this issue. It finds that Dick was not a producer of steam and would not have become one, concluding that there is no evidence that Dick was prepared to enter the steam market. The majority also finds as a matter of fact that Dick could have gained from misinformation about neighboring properties because it could have used the information to purchase the properties at lower prices.
 
 
 130
 Leaving aside the majority's improper usurpation of the role of fact-finder, its findings do not directly address Dick's allegations. Dick claims that the deprivation of royalties prevented it from amassing the resources necessary to purchase neighboring land. Dick alleges that not only did the conspiracy deprive it of funds needed to purchase steam leases, but, because of the lack of any steam production on most of its property, Dick was unable to enlist financial backing or joint venture interest in purchases of adjacent land. Dick claims that when it approached potential lenders or partners, they cited the lack of any steam production as the reason for rejecting the proposal. Dick also claims that the defendants purchased leases on neighboring land, leases for which Dick would have competed had defendants' conspiracy not interfered.
 
 
 131
 Strangely, the majority requires that, to establish standing, Dick prove precisely what Dick contends it should not have to prove on the merits--that the alleged violation tended to reduce competition in some market. If, as Dick maintains, the alleged horizontal conspiracy to suppress the output of steam constitutes a per se violation of Sec. 1 of the Sherman Act, it is not required to prove anti-competitive effect because that is presumed.
 
 
 132
 It is not necessary for a plaintiff alleging a per se violation to prove a reduction of competition in a relevant market to show that the "nature of the injury" factor is in its favor. See, e.g., Brunswick, 429 U.S. at 489, 97 S.Ct. at 697 (considering simply whether the plaintiff's injury "flows from that which makes defendants' acts unlawful"). The majority reformulation of the "nature of the injury" factor is problematic in cases such as this one where a dispute exists whether plaintiff has to demonstrate an anticompetitive effect, or whether such an effect is presumed. Moreover, the majority misapplies the "nature of the injury" factor to the injuries Dick alleges in both of the relevant markets--the steam market and the steam rights market.
 
 
 133
 The majority concludes that Dick's alleged injuries in both markets dictate that it be denied standing. The majority is plainly wrong.
 
 The Steam Market Injury
 
 134
 All of the injuries Dick alleges arise from "that which makes the defendants' conduct illegal." Most importantly, Dick alleges that it lost royalties as a result of the conspiracy to suppress the output of steam. Dick argues on the merits that the horizontal conspiracy to suppress steam production is a per se violation of the antitrust laws, whether or not that suppression had any impact upon price. If this argument is accepted, as it must be for standing purposes, then Dick's royalty losses stem directly from that which is illegal about appellees' conduct--that it suppressed output in the steam market. This alleged suppression is precisely what led to reduced royalties.
 
 The Steam Rights Market Injury
 
 135
 The majority's analysis of the steam rights market is also wide of the mark. Dick claims that the market value of its steam producing property and that of adjoining landholders has been reduced as a result of appellees' scheme because outsiders have been led to believe that there is less steam under Dick's land than actually exists. The majority concludes that Dick has suffered no injury in this regard because it purchased the property during the period of the conspiracy and may have purchased the property at bargain prices. This is pure speculation.
 
 
 136
 Dick alleges that the conspiracy reduced the value of its property as well as that of adjoining landowners. Dick does not limit this allegation to the period prior to its purchase of the land. The majority states that Dick made no showing that there was a reduction in value during this time. However, once again, Dick has never been required to prove, nor given an opportunity to prove, its actual injuries. The district court limited the trial to the issue of market injury, not injury to Dick. Dick's allegations of injury are broader than loss of value to its property. It asserts that the loss of royalties from the suppression deprived it of the means to compete in the steam rights market and that financial backers were scared away. These injuries are sufficient to meet the test of Associated General Contractors.
 
 III
 
 137
 In holding that Dick lacks antitrust standing, the majority opinion completely misinterprets and misapplies the relevant Supreme Court and Ninth Circuit caselaw. The Associated General Contractors factors it cites as weighing against Dick's standing actually weigh in favor of standing. Perhaps what is most disappointing is that the majority's wooden and mechanistic approach to antitrust standing completely disregards the concerns which animate the antitrust laws.
 
 
 138
 Section 4 of the Clayton Act broadly authorizes private damage actions under the antitrust laws: "Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefore ... and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." 15 U.S.C. Sec. 15. Despite the breadth of this provision, courts have, through the doctrine of antitrust standing, narrowed the universe of plaintiffs who may seek treble damages.
 
 
 139
 Courts have engaged in this narrowing process because "[i]t is reasonable to assume that Congress did not intend to allow every person tangentially affected by an antitrust violation to maintain an action to recover threefold damages for the injury to his business or property." McCready, 457 U.S. at 477, 102 S.Ct. at 2547. The problem, of course, is determining who Congress did intend to be free to invoke the antitrust laws.
 
 
 140
 Although "neither the statutory language nor the legislative history of Sec. 4 offers any focused guidance on the question of which injuries are too remote from the violation and the purposes of the antitrust laws to form the predicate for a suit under Sec. 4," courts are not completely without direction in conducting this narrowing enterprise. Id. Most significantly, courts must be careful not to "engraft artificial limitations on the Sec. 4 remedy" that are inconsistent with the broad objectives of the antitrust laws. Id. We must bear in mind that the private enforcement and treble damage provisions of the antitrust laws evince a clear Congressional purpose to accomplish more than simply compensating victims: these provisions allow antitrust plaintiffs to operate as private attorneys general vindicating the public interest in a free market economy. I am not sure the majority, which focuses so extensively on compensation for private injuries, takes this point seriously.
 
 
 141
 The majority's tunnel vision notwithstanding, it remains clear that the remedy provisions of the antitrust laws not only compensate private persons for their injuries, but give them a "powerful incentive ... to detect, disclose, attack and end violations of the antitrust laws. Private enforcement thus increases the likelihood that a violator will be found out, greatly enlarges the penalties and thereby helps discourage illegal conduct." 2 P. Areeda & D. Turner, Antitrust Law, p 331, at 150 (1978). In light of these objectives, courts have applied the doctrine of antitrust standing to carry out the broad remedial and deterrent scheme established by Congress. The rejection of a rigid black-letter rule and the adoption of pragmatic factors by the Associated General Contractors Court is faithful to these Congressional objectives. The majority's restrictive application of these factors is not.
 
 IV
 
 142
 In my view, appellees have waived any standing defense they might have had. Nevertheless, if standing is addressed, Mulvey is clear authority for Dick's standing. Associated General Contractors cannot be read as overruling Mulvey. Moreover, Dick has standing according to application of the factors set out in Associated General Contractors. Accordingly, I proceed to decide whether the alleged horizontal conspiracy to restrict output, if true, would constitute a per se violation of Sec. 1 of the Sherman Act.
 
 
 143
 In this regard, it should be clear that Judge Noonan's entire discussion of the merits is dictum.[10] Judge Noonan reaches the merits by asking whether Dick's injury--which under his analysis does not exist for the steam rights market--"is 'inextricably intertwined' with injury to competition." Maj. op. at 150. He refers to and then misstates McCready in asking this question. In McCready, the Court noted that plaintiff's injury "was inextricably intertwined with the injury the conspirators sought to inflict on psychologists and the psychotherapy market." McCready, 457 U.S. at 484, 102 S.Ct. at 2551 (emphasis added). The Court did not require actual proof of injury to competition. Indeed, as Justice Rehnquist pointed out, there were no allegations of injury to the market. Id. at 489, 102 S.Ct. at 2553. Judge Noonan's misunderstanding of McCready leads him to unnecessarily and wrongly discuss per se and Rule of Reason analyses. His proposition that "it has been broadly doubted whether the dichotomy between the Rule of Reason and the per se rule still exists or is helpful to analysis" is supported by no caselaw. In addition to being wrong, this bald statement is of little or no value as authority for future litigants in this Circuit.
 
 V
 
 144
 The gravamen of Dick's case is that the appellees horizontally conspired to suppress and did suppress the production of steam from Dick's land: to deter exploration and development of the steam reserves on Dick's property; to obtain leases on the property adjacent to Dick's property at artificially depressed prices; to deprive Dick of royalty revenue Dick needed to develop other geothermal steam reserves in the Geysers field; and to obtain Dick's interest in its property for an inadequate consideration. First Amended Complaint, paragraphs 20, 24-26. Although for the purpose of the trial on competitive injury, appellees stipulated that they had conspired with anticompetitive intent to restrict output by an amount equal to seven to nearly ten percent of the relevant market, the district court concluded that the horizontal output restriction was not an unreasonable restraint of trade under either per se or Rule of Reason analysis. R.C. Dick Geothermal Corp. v. Thermogenics, Inc., 619 F.Supp. 441 (C.D.Cal.1985). No procompetitive reasons for the restraint were ever identified.
 
 
 145
 The district court's decision is inconsistent with Supreme Court precedent and disruptive to antitrust law. Per se analysis applies if a "practice facially appears to be one that would always or almost always tend to restrict competition and decrease output " rather than increase competition and render markets more competitive. Broadcast Music, Inc. (BMI) v. CBS, 441 U.S. 1, 19-20, 99 S.Ct. 1551, 1562-63, 60 L.Ed.2d 1 (1979) (emphasis added). The district court's apparent conclusion that horizontal conspiracies to restrict output do not tend to decrease output is, in my view, simply wrong.
 
 
 146
 Horizontal agreements to fix prices and divide markets are per se violations of the antitrust laws because they indirectly tend to decrease output below the competitive level. It makes little sense to suggest that horizontal conspiracies directly aimed at decreasing output are not just as likely to tend to decrease output (and thus just as subject to per se analysis) as horizontal conspiracies to fix prices or divide markets. The result would allow businesses to achieve the same anticompetitive purposes through restricting output that they would have achieved if they could legally fix prices. See generally General Leaseways v. National Truck Leasing Ass'n, 744 F.2d 588, 594-95 (7th Cir.1984) (explaining how reducing output creates the same anticompetitive effects as raising prices or dividing markets).
 
 
 147
 The Supreme Court has condemned output restrictions as per se violations, noting that "[h]orizontal price fixing and output limitation are ordinarily condemned as a matter of law under an 'illegal per se ' approach because the probability that these practices are anticompetitive is so high." NCAA, 468 U.S. at 100, 104 S.Ct. at 2959. Thus, output restrictions are equated with horizontal price fixing and subject to per se analysis. Indeed, "[r]estrictions on price and output are the paradigmatic examples of restraints of trade that the Sherman Act was intended to prohibit." Id. at 107-08, 104 S.Ct. at 2963.
 
 
 148
 In NCAA, the Supreme Court held that the ordinarily applicable per se analysis did not apply to the particular case before it, but the Court made very clear that the only reason per se analysis did not apply was that there were unique procompetitive reasons for the horizontal restraint at issue. "[W]hat is critical is that this case involves an industry in which horizontal restraints on competition are essential if the product is to be available at all." Id. at 101, 104 S.Ct. at 2960. The Court reasoned that because the product offered by the NCAA consisted of contests between competing sports teams, some horizontal agreements between those sports teams were uniquely necessary to produce a product at all. Thus, the NCAA Court simply recognized a caveat to the per se rule against horizontal restraints on competition holding that some horizontal relationships have unique aspects that can create procompetitive justifications for particular horizontal restraints.[11]
 
 
 149
 The caveat to per se rule application does not apply in this case because no procompetitive justification has been alleged, much less a necessity to restrain output in order to have a product at all. It may be that "the behavior of the sellers was influenced by their decisions as to the rate at which they wanted to dispose of a very limited and depletable commodity" as Judge Noonan asserts, maj. op. at 152, but that does not explain why a horizontal agreement is necessary to determine the proper level of production. Making and selling a product requires individual producers to determine the proper level of output and the proper selling price. The whole point of forbidding horizontal combinations is to make sure that each individual producer makes this decision on its own so that market forces can determine the market's overall level of output and prices.
 
 
 150
 The district court failed to apply the per se rule because it erroneously viewed the relationship of the parties as "vertical." R.C. Dick, 619 F.Supp. at 448-49. The court noted Dick's contention that the plaintiffs were horizontal competitors, including the fact that two of the parties were joint steam operators on a neighboring property. However, it concluded that they were not competitors because they sequentially held rights in Dick's property. Id. It is difficult to square this ruling with the court's determination that the relevant market comprised the entire Geysers area. Id. Because the evidence is uncontroverted that the appellees held steam rights throughout this area, they must be considered horizontal competitors.[12]
 
 
 151
 In his analysis, Judge Noonan does not rely upon the district court's finding that this dispute involves a vertical arrangement. Instead, he concludes that per se analysis does not apply because there is no evidence of anticompetitive market injury. Maj. op. at 151-52. However, Judge Noonan is requiring Dick to prove the very thing he need not prove in a per se case. See NCAA. In other words, he demands that Dick prove that which is presumed under per se analysis.
 
 
 152
 In addition, the district court and Judge Noonan erroneously claim that per se analysis should not apply because this case involves business relationships with which the courts are not familiar. 619 F.Supp. at 449; Maj. op. at 151. On this point, Judge Noonan finds that the alleged agreement to suppress output is unusual because it involves restriction on the output of steam on a single piece of property, for a product "uniquely sold" in the Geysers region. Maj. op. at p. 151.
 
 
 153
 First, Judge Noonan confuses novel business relationships or restraints with unfamiliar industries. The Supreme Court has been reluctant to treat novel types of business relationships under per se rules, but has not hesitated to apply per se rules to industries that previously have not been the subject of litigation. The Supreme Court has rejected "the argument that we should not apply [a] per se rule [to a] case because the judiciary has little antitrust experience in the [particular] industry," Arizona v. Maricopa County Medical Soc'y, 457 U.S. 332, 349, 102 S.Ct. 2466, 2475, 73 L.Ed.2d 48 (1982), and has expressly distinguished that argument from "the established position that a new per se rule is not justified until the judiciary obtains considerable rule-of-reason experience with the particular type of restraint challenged," id. at 349 n. 19, 102 S.Ct. at 2475 n. 19. The Supreme Court rejected
 
 
 154
 the argument that the per se rule must be rejustified for every industry that has not been subject to significant antitrust litigation [because it] ignores the rationale for per se rules, which in part is to avoid the necessity for an incredibly complicated and prolonged economic investigation into the ... industry involved.
 
 
 155
 Id. at 351, 102 S.Ct. at 2476 (quotation omitted).
 
 
 156
 There is nothing novel about horizontal conspiracies to restrict output. Nor does Judge Noonan persuade that there exist any unique and heretofore unconsidered aspects to the business relationship among steam producers. The fact that the conspirators agreed to restrict output at one production site, instead of sharing the burden throughout the system, does not suggest a reason for insulating the agreement from per se analysis. Certainly no procompetitive reason is suggested for such a horizontal restraint.
 
 
 157
 In NCAA, the Court made clear that its failure to apply the per se rule was "not based on a lack of judicial experience with this type of arrangement." NCAA, 468 U.S. at 100, 104 S.Ct. at 2959. "While judicial inexperience with a particular arrangement counsels against extending the reach of per se rules, the likelihood that horizontal price and output restrictions are anticompetitive is generally sufficient to justify application of the per se rule without inquiry into the special characteristics of a particular industry." Id. at 100 n. 21, 104 S.Ct. at 2959-60 n. 21 (emphasis added and citations omitted). NCAA is thus definitive precedent for the proposition that horizontal output restrictions are not an unfamiliar business relationship. The only unfamiliar feature of this case is that it involves the geothermal steam market. If, in contradiction of Supreme Court authority, we allow the unfamiliarity of an industry to act as a bar to applying per se rules, we can expect a stream of litigants arguing that a conspiracy to fix prices or divide markets is not presumptively illegal in their particular industry.
 
 
 158
 Finally, even if the per se rule did not govern this case, the district court's holding that the output restriction survives Rule of Reason analysis because the competitors lacked sufficient market power to affect the overall output is also inconsistent with Supreme Court authority. Market power need not be proven under Rule of Reason analysis where there exists a "naked restriction on price or output." Id. at 109, 104 S.Ct. at 2964. Judge Noonan erroneously concludes that a restriction on price or output is not "naked" unless an actual anticompetitive effect, such as diminished output or higher prices, is proven. Opinion pp. 150-151. His opinion confuses two independent reasons for dispensing with proof of market power.
 
 
 159
 Although proof of actual detrimental price-output effects can obviate the need for proof of market power, the Supreme Court clearly indicated that the "naked" nature of a restraint is a completely separate reason for avoiding proof of market power. Federal Trade Comm'n v. Indiana Fed. of Dentists, 476 U.S. 447, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986). In that case the Supreme Court held that proof of market power was not required to condemn the agreement at issue because a horizontal agreement not to offer a particular service was, in and of itself, " 'a naked restriction on price or output' and that such a restriction 'requires some competitive justification even in the absence of a detailed market analysis.' " Id. at 460, 106 S.Ct. at 2018 (quoting NCAA, 468 U.S. at 109-10, 104 S.Ct. at 2964-65). The Court went on to hold that "even if the restriction imposed ... is not sufficiently 'naked' to call this principle into play," the agreement still failed Rule of Reason analysis because the evidence showed that the services the conspirators had agreed to withhold were actually unattainable. Id. Clearly, thus, the nakedness of a restriction and proof of actual detrimental effects are alternative grounds for obviating proof of market power. The district court should have summarily condemned the horizontal output restraint even under Rule of Reason analysis as a naked restraint on output without procompetitive justification.[13]
 
 
 160
 "Antitrust laws in general, and the Sherman Act in particular, are the Magna Carta of free enterprise." United States v. Topco Assocs., 405 U.S. 596, 610, 92 S.Ct. 1126, 1134, 31 L.Ed.2d 515 (1972). Adherence to per se rules "is grounded not only on economic prediction, judicial convenience, and business certainty, but also on a recognition of the respective roles of the Judiciary and the Congress in regulating the economy." Maricopa County, 457 U.S. at 354, 102 S.Ct. at 2478.
 
 
 161
 Defining markets and determining the presence of market power is not socially costless. Using up the time and energy of courts and lawyers wastes resources when the challenged conduct of a pernicious type lacks any offsetting legitimate objective. Moreover, complicating and perhaps forestalling the condemnation of such conduct weakens deterrence of such unredeemed behavior.
 
 
 162
 7 P. Areeda, Antitrust Law, p 1509, at 411 (1986). We should not permit the strength of our per se rules to be eviscerated "when the most [defendants] can say for themselves is that they tried to harm the public but were mistaken in their ability to do so." Id.
 
 
 163
 The failure to condemn summarily the output restriction led the district court into an inquiry about "the competitive level of output" that judges are ill-equipped to conduct and which itself demonstrates why per se rules are necessary. Proof of chronic unmet demand, coupled with the stipulation that the horizontal conspirators had agreed to withhold seven to nine percent of the available supply, should have compelled the conclusion that the agreement had anticompetitive effects. The district court, however, seemed to require proof not only that output was suppressed but that the competitive level of output would have been different. Any comparison of the output resulting from the conspiracy with a hypothetical "competitive" level of output is directly analogous to the long-condemned argument that courts must determine whether fixed prices are "reasonable" or higher than competitive prices. See, e.g., Maricopa County, 457 U.S. at 345-47, 102 S.Ct. at 2473-74. The only reasonable level of output or reasonable price is the output and price determined by free market forces. A horizontal conspiracy is "not entitled to pre-empt the working of the market by deciding for itself that its customers do not need that which they demand." Indiana Fed. of Dentists, 476 U.S. at 462, 106 S.Ct. at 2019-20.[14]
 
 
 164
 To summarize, because this case involves an allegedly naked horizontal restraint on output, one without any procompetitive justifications, the defendants' conduct should be judged under the per se rule, not under the Rule of Reason.
 
 
 
 [1]
 Defendants were involved in developing the steam under Dick's land, in addition to other properties. Geothermal Resources, Inc. (GRI) acquired steam rights in the Dick property in 1966. In 1970, GRI transferred its rights to Resources Investment Company (RIC), a subsidiary of Hughes Aircraft Company. Another Hughes subsidiary, Thermogenics, Inc. (TGI), took over a year later. GRI reacquired rights to the Dick property in 1982. Between 1971 and 1977, TGI contracted with defendants Pacific Energy Corp. (PEC) and Callon Petroleum companies, both owned by John Callon, for development and management of the steam rights to Dick's property. Between 1973 and 1977, TGI and PEC also were joint venturers in developing the Filley property, which adjoined Dick's land
 
 
 [2]
 Dick filed its original complaint in 1979, alleging a horizontal conspiracy to suppress and suppression of steam production from Dick's land for anticompetitive purposes. Extensive pre-trial proceedings included two defense motions for summary judgment, which were for the most part granted. Subsequently, the judge conducted a 22-day bench trial spread over 14 months to decide whether Dick could prove competitive injury to the steam market. Final judgment for the appellees was entered in 1985. R.C. Dick Geothermal v. Thermogenics, Inc., 619 F.Supp. 441 (C.D.Cal.1985). The original panel handed down its decision on March 16, 1988. The court ordered rehearing en banc and the case was argued to this en banc panel on May 12, 1988
 
 
 [3]
 In my view, deciding the antitrust standing issue without post-briefing argument does violence to Fed.R.App.P. 34(a) and 9th Cir.R. 34-4
 
 
 [4]
 Dick's action was based upon Secs. 1 and 2 of the Sherman Act, 15 U.S.C. Secs. 1-2 (1988). His appeal concerns only section 1 claims
 
 
 [5]
 The majority finds that the district court made factual findings and rulings sufficient to permit a decision as to standing. Opinion p. 13033. However, the district court made no findings of fact or rulings of law on standing
 The majority's reference to Bubar v. Ampco Foods, Inc., 752 F.2d 445, 449 (9th Cir.), cert. denied, 472 U.S. 1018, 105 S.Ct. 3481, 87 L.Ed.2d 616 (1985), is misplaced. In Bubar, summary judgment in favor of defendants was granted on the basis that the plaintiffs lacked standing and this was the sole issue raised on appeal by plaintiffs. Unlike the present case, plaintiffs in Bubar had ample opportunity to develop the record on standing in the district court, and thus de novo review based upon the entire record was appropriate.
 Here, the district court tried only the question of anticompetitive effects in the steam market. To decide this question, Dick was required to show injury to the market, not injury to itself. While a plaintiff attempting to show anticompetitive effects in a market might begin by demonstrating injury to itself, a plaintiff knowing that antitrust laws "were enacted for the protection of competition, not competitors," Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977) (quotation and emphasis omitted), could reasonably decide to focus on the market as a whole. Moreover, the existing record fails to demonstrate as a matter of law that Dick suffered no injury.
 
 
 [6]
 To its credit, the majority does not accept appellees' assertion that Steiner and Mulvey are inconsistent with Eagle v. Star-Kist Foods, Inc., 812 F.2d 538 (9th Cir.1987). Eagle cited neither Steiner nor Mulvey, and denied plaintiff workers antitrust standing on the ground that plaintiffs' injuries were indirect and derivative from those suffered by the employer. Eagle is a classic Illinois Brick Co. v. Illinois, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), fact situation
 
 
 [7]
 The majority characterizes Steiner and Mulvey as cases utilizing a "target area" approach, which it says is rejected by Associated General Contractors. However, the short discussion of standing in Steiner questions only whether the appellant's interest is sufficiently close and direct to make the plaintiffs a proper party to complain of the alleged conspiracy. The court in Mulvey refers to "target area" in restricting the right to bring an antitrust action to those persons "within that area of the economy which is endangered by a breakdown of competitive conditions in a particular industry." Mulvey, 433 F.2d at 1076. Ironically, the question in Mulvey was not whether this Circuit's test of standing was too broad, in light of Supreme Court decisions, but rather whether it was too narrow. Id. In any event, contrary to what the majority asserts, Associated General Contractors does not "explicitly" reject Steiner and Mulvey, nor even cite them. Rather, the Court simply cautions against the use of any single label or test as black-letter law. Its pragmatic approach is far from overruling Mulvey and Steiner. See, infra at 156
 
 
 [8]
 The Court lamented the fact that the union had not alleged any specific injuries, but instead had alluded only to unspecified injuries in "business activities." Given this vague allegation, the Court attempted to hypothesize possible injuries
 
 
 [9]
 In McCready, standing existed even though there was no showing that McCready's economic injuries--her unreimbursed psychologist's fees--resulted from the anticompetitive nature of defendants' illegal conduct. Although McCready was a consumer of psychotherapy, there was, as Justice Rehnquist pointed out vigorously in dissent, no allegation that "the conspiracy has affected the availability of the psychological services she sought and actually obtained. Nor does she allege that the conspiracy affected the price of the treatment she received." 457 U.S. at 489, 102 S.Ct. at 2553. Nonetheless, the majority found standing because plaintiff's injury was "inextricably intertwined with the injury the conspirators sought to inflict on psychologists and the psychotherapy market." Id. at 484, 102 S.Ct. at 2551
 
 
 [10]
 Judge Noonan's gratuitous discussion of the per se issue does not command a majority of the en banc panel
 
 
 [11]
 This caveat applies equally to application of per se analysis to horizontal price fixing, as demonstrated by the opinion in BMI. There the Court held that a particular horizontal price fixing agreement, where associations of composers sold their musical performance rights for a fixed fee via a collective blanket license, was so justified by unique procompetitive reasons that the per se rule against price fixing did not apply. See BMI, 441 U.S. at 20-24, 99 S.Ct. at 1562-64. Moreover, the Court stressed, as it did in NCAA, that the product being sold would not be available at all but for the horizontal agreement. Compare BMI, 441 U.S. at 22-23, 99 S.Ct. at 1563-64, with NCAA, 468 U.S. at 101, 104 S.Ct. at 2960
 
 
 [12]
 As to appellees' relationship in Dick's property, the district court was understandably uneasy about applying the label "vertical." R.C. Dick, 619 F.Supp. at 448. The sequential rights that most of the developers held were neither horizontal nor vertical. Only TGI's relationship with the Callon companies on Dick's property could be called vertical. However, at the same time this relationship existed, TGI and PEC were involved in a joint venture for production of steam from the neighboring Filley property, making them horizontal competitors as well
 
 
 [13]
 Further support for the proposition that naked restraints on competition cannot survive Rule of Reason analysis absent procompetitive justification appears in the Court's earlier statement regarding horizontal agreements to withhold services: "Absent some countervailing procompetitive virtue--such as, for example, the creation of efficiencies in the operation of a market or the provision of goods and services--such an agreement limiting consumer choice by impeding the 'ordinary give and take of the marketplace' cannot be sustained under the Rule of Reason." 476 U.S. at 459, 106 S.Ct. at 2018 (citations omitted). On its face, this statement indicates that a naked restraint on competition cannot survive Rule of Reason analysis solely because no anticompetitive effect is shown. There must be a procompetitive virtue shown
 
 
 [14]
 It makes no difference that the customer in this case, P.G. & E., was apparently a monopsony. Courts have never permitted horizontal restraints to be justified by the argument that a horizontal combination is necessary to exercise countervailing monopoly power. The majority errs when it assumes that no conceivable anticompetitive goal or effect could be shown because the monopsony controlled prices. It stands to reason that restricting the supply of goods to a monopsony, particularly when that monopsony faces chronic unmet demand, may provide the necessary leverage to force the monopsony to raise prices. Proof that a restriction on supply actually raised prices is not required to show an anticompetitive evil. Indiana Fed. of Dentists, 476 U.S. at 461-62, 106 S.Ct. at 2019-20